**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Robert CONWAY, Appellant.**

Superior Court of Pennsylvania.

Argued March 24, 2010.

Filed Jan. 11, 2011.

Reargument Denied March 16, 2011.

Craig M. Codey, New York, New York, for appellant.

Robert M. Falin, Assistant District Attorney, Norristown, for appellee.

BEFORE: DONOHUE, OTT, JJ., and McEWEN, P.J.E.

OPINION BY McEWEN, P.J.E.

Appellant, Robert Conway, appeals from the order of the trial court denying his request to order DNA testing of certain items within the control of the Commonwealth that were obtained in the course of its 1987 investigation and prosecution of appellant on charges of murder and related offenses. We are compelled to reverse.

The germane facts of this case were ably summarized by the learned Judge S. Gerald Corso in the Opinion he filed in response to appellant's appeal:

## I. PROCEDURAL HISTORY

The defendant was arrested on December 12, 1986, in connection with the stabbing death of Michele Capitano on September 25, 1986, at Wooley's Surgical Supply Store in Norristown, Montgomery County. At the conclusion of a four-day trial, a jury found the defendant guilty on September 24, 1987, of Murder of the Third Decree, Unlawful Restraint and Possession of an Instrument of Crime.[1]

---

[1] The jury found the defendant not guilty of Murder of the First Degree, Murder of the Second Degree, Criminal Attempt at Rape, Indecent Assault, Robbery and Theft.

After denying post-verdict motions, the court sentenced the defendant on May 1, 1989, to an aggregate term of imprisonment of 15 to 30 years. The Superior Court affirmed the judgment of sentence, and the Supreme Court of Pennsylvania denied *allocatur* in 1991.

The defendant filed a motion for post conviction DNA testing, with a supporting memorandum of law, on June 12, 2008. The Commonwealth opposed the motion in an answer filed on November 10, 2008. The defendant filed a response to the Commonwealth's answer on December 30, 2008.

The court held a hearing on March 5, 2009, at which the parties presented oral argument. Thereafter, upon consideration of the motion, the parties' memoranda of law, the arguments of counsel and the record at trial, the court issued an order on May 5, 2009, denying the motion on the basis that the defendant had failed to present a *prima facie* case demonstrating that DNA testing of the specific evidence would establish his actual innocence.[2] From that order, the defendant filed a timely appeal.

---

[2] As noted in the order, having concluded that the defendant failed to make a *prima facie* case, the court did not consider the Commonwealth's argument that the request for DNA testing is untimely. *Commonwealth v. Brooks*, 875 A.2d 1141, 1146 (Pa.Super.2005).

## II. FACTUAL BACKGROUND

On September 25, 1986, at approximately 9:30 a.m., the then 29–year–old defendant left the apartment he shared with his wife, Ann Dawn Conway, at 660 Noble Street in Norristown. He planned to go for a walk, look for a cane and hot packs for his wife and pick up prescriptions for his wife and himself.

At approximately 10:30 a.m. that same day, Capitano arrived at her place of business, Wooley's Surgical Supply Store, then-located at 532 DeKalb Street in Norristown, and received a telephone call from her friend and business associate, Anita Ferris.[3] Around that same time, Eneida Piccarreta, an employee of La Roma's Pizzeria, which was located a few doors away from Wooley's saw the defendant walking down DeKalb Street in the direction of Wooley's.

---

[3] Ferris testified that she first called Wooley's at approximately 10:10 a.m., but hung up when she got the answering machine. She then called back at approximately 10:30 a.m., at which time Capitano answered and indicated that she had just arrived at the store.

The telephone conversation between Capitano and Ferris was interrupted briefly at one point when Capitano told Ferris to hold on while she went to let a neighborhood dog into the store. The telephone call then resumed until momentarily interrupted again at approximately 10:41 a.m. when a mailman, Anthony Jan Francisco, entered Wooley's to deliver mail.[4] With the mailman's departure, the telephone conversation resumed for a few more minutes until interrupted a third time by the sound of a male voice in the store.[5] At that time, Ferris asked Capitano if she had a patient, to which Capitano responded, "Oh, I don't know. I'll call you right back." The telephone call ended at approximately 10:45 a.m.

---

[4] Jan Francisco testified that he entered the store on the day in question through the unlocked front door. He found this unusual because the door typically was locked and he would have to knock for Capitano to open it in order to deliver mail.

[5] Ferris testified that the voice sounded different from that of the mailman.

At approximately 10:55 a.m., Piccarreta observed the defendant banging on the door to La Roma's Pizzeria, which normally did not open until 11:00 a.m. Her stepson, Peter Piccarreta, opened the door and observed that the defendant was wearing a brown t-shirt that was wet in the front, but not in the back. The defendant, who did not speak to anyone in the pizzeria, purchased something from a vending machine and left.

Around this same time, Michael Clerico, Michael Burke and Rita McColgan began walking toward Wooley's from the title search office operated a few doors away by Clerico and Burke. The three planned to get a key from Capitano in

connection with a potential purchase of the building that housed Wooley's.

Upon arriving at the store, Clerico, Burke and McColgan observed the front door to be wide open. The three peered inside and called for Capitano before returning outside to see if she had momentarily left the building. Failing to see her, they returned to the store, at which time they observed a receipt book and watch on the floor, as well as a purse with its contents spilled out.

Proceeding farther into the store, and following the path of the items strewn on the floor, Clerico opened the bathroom door slightly and observed Capitano's feet. Clerico immediately told Burke to contact the police. Burke and McColgan left the store, and Burke telephoned the police from the title insurance office.

Norristown Police records indicate receipt of Burke's call at 11:07 a.m. The first-responder to the scene, Norristown Police Officer Leonardo Liberatascioli, arrived between 11:09 and 11:11 a.m. After briefly speaking with Clerico, Burke and McColgan, Officer Liberatascioli peered into the bathroom through the slightly opened door and saw Capitano's feet.

Officer Liberatascioli then pushed the door open far enough to partially enter the bathroom, at which time he observed Capitano lying face up on the floor with her head under the sink and her eyes and mouth open. He observed that Capitano had sustained numerous puncture wounds, that her dress had been opened in the chest area and pulled up around the waist, and that her pantyhose had been split open exposing the vaginal area.

At approximately 11:00 a.m., the defendant returned to his apartment, which was located approximately three-quar-ters of a mile from Wooley's. Ann Conway, who was in the apartment at the time, testified that her husband, appearing nervous and upset, told her that he had found a woman's body tied up in the "cane store." The defendant told his wife he had gotten blood on his hands, but she did not observe any.

In response, Ann Conway telephoned the Norristown Police at approximately 11:10 a.m. to report what her husband had told her. She also telephoned Dr. Edward J. Murphy, who had been providing psychological counseling to the defendant since September of 1985. The defendant then briefly spoke with Dr. Murphy.

Prior to the police arriving, the defendant washed his hands in the bathroom sink of the apartment. He also left the apartment at one point to use the bathroom in his sister-in-law's house, which was located across the street from the Conways' apartment.

At approximately 11:25 a.m., Norristown Police Officer Joseph Byrnes and Montgomery County Detective Stanley Kadelski responded to the defendant's apartment. After speaking with Ann Conway, they found the defendant sitting in a chair in the apartment. They observed that his hair, t-shirt and arms were completely wet, while his face was dry. They also noticed that the defendant's pants were saturated in the front, but dry in the back.

During a discussion with Detective Kadelski, the defendant stated that he had gone to Wooley's to get a cane for his wife, that he had found a woman lying on the bathroom floor, that he did not know if she was dead or alive and that he had turned her over to try to untie her "bounds." At that time, Detective Kadelski, who had observed Capitano at the scene prior to going to the defen-

dant's home, was not aware that her hands had been bound.[6] The defendant also stated that the clothes he was wearing were the same as those he had on while at Wooley's.

[6] Similarly, Officer Liberatascioli and Montgomery County Detective John Durante, both of whom removed Capitano's body from the scene, testified at trial that they did not observe that her hands had been bound. Paramedic William Peters, who examined Capitano at the scene, testified that he did not observe that her hands had been bound. Detective Durante did not determine that Capitano's hands had been bound until he viewed the body at the hospital later that evening.

Detective Kadelski requested that the defendant and his wife go to the Norristown Police Station to give statements. The defendant agreed, while his wife, who was babysitting at the time, offered to go to the station later in the day. Because the defendant did not have transportation, he agreed to go to the station in a patrol car driven by Officer Byrnes. Before leaving his apartment, the defendant put on the same boots he had been wearing earlier in the day. Moments after the patrol car pulled away from the apartment, the defendant indicated that he also had been wearing a light blue work shirt when he was at Wooley's, but that it was somewhere back at his apartment.[7] In response, Officer Byrnes backed the patrol car to the defendant's apartment.

[7] Peter Piccarreta testified that when he saw the defendant at La Roma's Pizzeria, the defendant was neither wearing nor holding a blue work shirt.

Leaving the defendant and Detective Kadelski in the patrol car, Officer Byrnes entered the defendant's apartment and informed Ann Conway that her husband said he had been wearing a blue work shirt. After looking around the apartment, Ann Conway pulled a rolled up blue work shirt from under a pile of clothes and gave it to Officer Byrnes.[8] During this time, Officer Byrnes asked Ann Conway what type of work her husband did. She responded that the defendant was unable to work due to a head injury, and that he spent time gardening. Officer Byrnes asked if the defendant used any tools for gardening, to which Ann Conway responded that the only gardening tool the defendant used was a knife that she had purchased for him.

[8] The defendant later stated that it was the shirt he had been wearing.

Upon resuming the drive to the police station, Officer Byrnes told Detective Kadelski that Ann Conway said she had purchased a knife for her husband. Detective Kadelski responded that he had noticed something in the defendant's back pocket that could be a knife. During the ride, the defendant said that his clothes were wet with sweat from the "forced march" home he had made after discovering the body.

Having reached the police station, Officer Byrnes asked the defendant for permission to look in the defendant's back pocket. The defendant agreed, and Officer Byrnes removed a pocket knife. The blade measured in excess of three-quarters of an inch at its widest point and slightly more than three-and-seven-eighths inches long.

At the station, the defendant again agreed to give a statement. During this time, the defendant was observed to have a bump on his head and two fresh scratch marks on his right bicep. While the defendant could not recall the exact source of the scratches on his arm, he said they could have come from walking through trees and bushes earlier in the morning. The defendant said he may

have sustained the bump on his head when he fell in the store's bathroom. According to the defendant's tape recorded statement, which was played for the jury, he left his apartment on the morning of the day in question and spent some time sleeping in the nearby park. Thereafter, the defendant entered Wooley's with the intention of buying his wife a cane. He found the store empty, and called out to determine if anyone was present. He said he eventually found a woman on the bathroom floor. He noticed the bloody condition of the woman's body, opened her dress to check for a heartbeat and attempted to untie the "bounds" around her hands. When he determined that the woman probably was dead, he may have washed his hands in the bathroom sink before leaving the store. The defendant did not telephone police from Wooley's because he had been upset by what he had observed. After being asked to turn over to police the clothes he was wearing, the defendant said that at some point he may have tripped over the woman's body and fallen on top of her. Prior to giving his recorded statement, the defendant told Detective Kadelski that he had stopped at a candy store to buy a pack of crackers after leaving Wooley's. In the recorded statement, the defendant said he did not recall stopping anywhere on his way home. The defendant also could not recall during his recorded statement the time at which he entered Wooley's, but later that day he told Montgomery County Detective William Davis that he had entered the store at 10:35 a.m.

At approximately 10:45 p.m., Dr. Halbert Fillinger, a forensic pathologist, conducted a post-mortem examination of Capitano. As a result of that examination, he concluded that Capitano had died from multiple stab wounds. Specifically, he found that Capitano had approximately 59 stab wounds to the chest, 11 stab wounds to the upper abdomen, approximately nine stab wounds to the neck, and approximately six defensive wounds to the left hand. Dr. Fillinger testified that the defensive wounds on the back of the hand "are most frequently seen when the hand is used to ward off some kind of an instrument," while the defensive wounds on the palm "are most frequently seen when someone grabs a sharp instrument, trying to hold it away or trying to hold on to it."

From the size of the various wounds, Dr. Fillinger opined that the instrument used to stab Capitano was at least three inches in length and at least three-quarters of an inch, but not more than an inch, at its widest point.

Dr. Fillinger stated that, at the time of her death, Capitano had been wearing pantyhose that had been ripped away from the vaginal area. She also had been wearing a slip that had been pulled up around her thighs. On top of the slip, Capitano had been wearing a tan dress, which had been pulled up around the pubic area. The top of the dress had a small zipper that had been broken open. Above the dress, Capitano had been wearing a white lab coat. Dr. Fillinger testified that he found more stab wounds in Capitano's chest than in the dress, indicating that the dress had been open at the time of the assault. Dr. Fillinger also found that Capitano's hands had been bound behind her back with a blue strip of cloth.

Dr. Fillinger took oral, vaginal and rectal swabs from Capitano, as well as pubic hair combings and blood samples. While Dr. Fillinger did not take fingernail clippings from Capitano, Detective Durante did.

The Montgomery County Detective's Office subsequently submitted numerous pieces of evidence to the Federal Bureau of Investigation for testing, including: bloodstained paper towels found near Capitano's left hand; Capitano's purse and its contents; fingernail clippings from Capitano; the piece of blue cloth found tied around Capitano's hands, the lab coat; the dress; the slip; the pantyhose; the brassiere; rape kit items; and the defendant's clothes and boots.

The FBI testing found that the blood on the paper towels, the blue cloth, the lab coat, the dress, the slip, the brassiere and the pantyhose was consistent with Capitano's blood but not consistent with the defendant's blood. While testing revealed the presence of blood on one of the defendant's boots, it could not be determined whether the blood was human or animal. Tests performed on the knife taken from the defendant did not reveal the presence of blood. Testing of the rape kit items and pantyhose did not reveal the presence of semen.

By stipulation, the court informed the jury that no foreign hairs or fibers were found on Capitano's clothing, her vaginal area or any items removed from Wooley's. More specifically, the parties stipulated that no hair or fibers from the defendant were found on Capitano or her clothing, and that no hair or fibers belonging to Capitano were found on the defendant's clothing. The parties also agreed that none of the more than 30 fingerprints lifted from the scene came from the defendant.

Additional evidence produced at trial indicated that the defendant had suffered a work-related head injury in 1984 that caused him to have cognitive difficulties and memory loss. In particular, Dr.

Murphy opined that he did not believe the defendant was capable of validly remembering the details of what happened on the day in question.

The Commonwealth also offered testimony from an inmate who had occupied a cell next to the defendant's for a few days toward the end of May 1987. The inmate testified that the defendant told him he had gone to Wooley's to get a cane for his wife, that a woman who had been on the telephone in the back of the store had caught him stealing, that the woman hit him on the head, that he then went into shock and freaked out, but that he did not mean to hurt the woman. The inmate further said that the defendant indicated that some people may have seen him go into the store, and that no blood would be found on the knife. Montgomery County Detective Cedric J. McKeever testified that he was familiar with what information had been made public about the case and what information had not. Specifically, he said information that had not been released to the public included the presence of construction workers near the store, the absence of blood on the knife obtained from defendant, the victim being on the telephone and the defendant being hit on the head.

The defense sought to counter the inmate's testimony with evidence that he had a criminal record involving crimes of dishonesty, and had, in the past, sought leniency in exchange for providing informant testimony. The inmate denied receiving any promises in return for his testimony in this case.

Trial Court Opinion, June 11, 2009, pp. 1–12 (record citations omitted).

The trial court denied appellant's request for DNA testing of certain designated items,[1] namely: blood-stained paper

---

1. The record reveals that all of the designated items are in existence and within the control

towels found near the victim, fingernail clippings from the victim's hands, a piece of blue cloth that had been tied around the victim's hands; rape kit samples; the victim's blood-stained lab coat, the victim's blood-stained dress, the victim's blood-stained half slip, the victim's blood-stained brassiere, the victim's pantyhose, and the victim's purse and contents thereof. This appeal followed.

Appellant, in the brief filed in support of this appeal, raises a single question for our review:

Whether the PCRA court erred when it concluded that there is no reasonable possibility that DNA testing could prove Robert Conway's [appellant's] actual innocence?

Brief of Appellant, p. 2.

 Post conviction DNA testing falls under the aegis of the Pennsylvania Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541–9546,[2] and thus, "[o]ur standard of review permits us to consider only whether the PCRA court's determination is supported by the evidence of record and whether it is free from legal error." *Commonwealth v. Brooks*, 875 A.2d 1141, 1144 (Pa.Super.2005) (citations omitted). Moreover, because the resolution of this appeal involves statutory construction, which involves a pure question of law, we review that aspect of the trial court's decision *de novo* and our scope of review is plenary. *See: Campbell v. Walker*, 982 A.2d 1013, 1014 n. 3 (Pa.Super.2009), *citing Lynne-*

*brook and Woodbrook Assoc., L.P. v. Borough of Millersville*, 600 Pa. 108, 111 n. 2, 963 A.2d 1261, 1262 n. 2 (2008).

Section 9543.1 of Title 42, the specific section that governs post conviction DNA testing, provides, in pertinent part:

(1) An individual convicted of a criminal offense in a court of this Commonwealth and serving a term of imprisonment or awaiting execution because of a sentence of death may apply by making a written motion to the sentencing court for the performance of forensic DNA testing on specific evidence that is related to the investigation or prosecution that resulted in the judgment of conviction.

(2) The evidence may have been discovered either prior to or after the applicant's conviction. The evidence shall be available for testing as of the date of the motion. If the evidence was discovered prior to the applicant's conviction, the evidence shall not have been subject to the DNA testing requested because the technology for testing was not in existence at the time of the trial or the applicant's counsel did not seek testing at the time of the trial in a case where a verdict was rendered on or before January 1, 1995,[3] or the applicant's counsel sought funds from the court to pay for the testing because his client was indigent and

of the Commonwealth.

2. The one year jurisdictional time bar that exists under the Pennsylvania Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541–9546, does not apply to motions for the performance of forensic DNA testing under Section 9543.1. *Commonwealth v. Brooks*, 875 A.2d 1141, 1146 (Pa.Super.2005) (emphasis deleted) (footnote omitted) (citations omitted). "Rather, after DNA testing has been complet-

ed, the applicant may, within 60 days of receiving the test results, petition to the court for post-conviction relief on the basis of after-discovered evidence, an exception to the one-year statute of limitations." *Id.* (citations omitted). As such, at this juncture there is no jurisdictional impediment to our review.

3. Here, appellant's conviction occurred in 1987.

the court refused the request despite the client's indigency.

42 Pa.C.S. § 9543.1(a). An individual seeking relief under this statute must:

> [P]resent a *prima facie* case demonstrating that the:
>
> (i) identity of or the participation in the crime by the perpetrator was at issue in the proceedings that resulted in the applicant's conviction and sentencing; and
>
> (ii) DNA testing of the specific evidence, assuming exculpatory results, would establish:
>
> (A) the applicant's actual innocence of the offense for which the applicant was convicted[.]

42 Pa.C.S. § 9543.1(c)(3)(i), (ii)(A). The statute also provides that a court shall not order DNA testing if, after review of the record of the applicant's trial, the court determines:

> [T]hat there is no reasonable possibility that the testing would produce exculpatory evidence that:
>
> (i) would establish the applicant's actual innocence of the offense for which the applicant was convicted[.]

42 Pa.C.S. § 9543.1(d)(2)(i).

▆ Thus, as this Court has previously summarized, on its face, the *prima facie* requirement set forth in § 9543.1(c)(3) and reinforced in § 9543.1(d)(2) requires that an appellant demonstrate that there is a "reasonable possibility,"[4] that "favorable results of the requested DNA testing *'would establish'* the appellant's actual innocence of the crime of conviction." *Commonwealth v. Brooks, supra,* 875 A.2d at 1147, quoting *Commonwealth v. Heilman,* 867 A.2d 542, 546–547 (Pa.Super.2005), *appeal denied,* 583 Pa. 669, 876 A.2d 393 (2005) (emphasis in *Heilman*).

The parties to this appeal agree, as did the trial court, that the definition of "actual innocence" that is to be applied in the evaluation of the effect of new evidence is that articulated by the United States Supreme Court in its Opinion in *Schlup v. Delo,* 513 U.S. 298, 327, 115 S.Ct. 851, 867, 130 L.Ed.2d 808, 836 (1995), namely, that the newly discovered evidence must make it "more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt." Thus, this standard requires a reviewing court "to make a probabilistic determination about what reasonable, properly instructed jurors would do," if presented with the new evidence. *Id.,* 513 U.S. at 329, 115 S.Ct. at 868, 130 L.Ed.2d at 837.

A review of the record in this case reveals the following salient points:

- Appellant was convicted solely on circumstantial evidence.
- Appellant does not deny that he was present at the murder scene—in fact he claims to have discovered the body, and subsequently advised his wife to report the crime to the police.
- Appellant, on the day of the homicide, provided a statement to the police in which he admitted touching the body of the deceased victim for the purpose of determining whether she was alive.
- The Commonwealth did not introduce any DNA or other scientific evidence tying appellant to the body of the victim or the location—specifically the bathroom—where the body was discovered.

Thus, given the fact that appellant's own DNA could be found on some of the victim's clothing or other items, it is apparent that the testing of those items may produce evidence that actually reinforces the Commonwealth's identification of appellant

4. *See:* 42 Pa.C.S. § 9543.1(d)(2).

as the perpetrator of the crime. Moreover, it is acknowledged that the mere absence of appellant's DNA on any of the tested items will not provide compelling evidence of his innocence. *See: Commonwealth v. Heilman, supra,* 867 A.2d at 547 ("In DNA as in other areas, an absence of evidence is not evidence of absence."). Nevertheless, appellant advances three [5] arguments, grounded in three plausible theories that he contends, whether singly or in concert, warrant the testing of the items: (1) a "redundancy" theory, which postulates that if the individual DNA tests reveal evidence of a third person on multiple items connected with the crime, then those "redundant" results would give rise to an inference of a separate assailant; (2) a "data bank" theory, which postulates that any DNA results that are obtained from DNA testing that prove the presence of an unknown person could be run through state and federal data banks for a match, which, if successful, would lead to the identification of a separate assailant; and (3) a "confession" theory, which postulates that an assailant who is discovered by using the data bank theory could, when confronted with the DNA evidence, confess to the crime. In response to these arguments the Commonwealth contends, *inter alia,* (1) that any results produced by DNA testing would be too "speculative," and (2) that no post conviction testing is appropriate under the facts of this case because the circumstantial evidence produced at trial was "overwhelming."

We tarry not with the Commonwealth's second argument, since the relative weight of the Commonwealth circumstantial evidence would obviously be outweighed by the discovery of relevant DNA evidence constituting substantial direct evidence of the identity of a separate assailant. Moreover, the statutory language requires reviewing courts to evaluate the "actual innocence of the offense" component by "assuming exculpatory results" will be obtained from the proposed testing. *See:* 42 Pa.C.S. § 9543.1(c)(3)(ii).

Turning to the Commonwealth's first argument, namely that appellant's claims, particularly his data bank claims, are too speculative, the Commonwealth relies in substantial measure on the decision of this Court in *Commonwealth v. Smith,* 889 A.2d 582 (Pa.Super.2005), *appeal denied,* 588 Pa. 769, 905 A.2d 500 (2006). Specifically, the Commonwealth cites to the language of a footnote in that case, and seeks to extrapolate from that footnote a definitive holding that would preclude the grant of relief to appellant.

This Court, in *Smith,* was reviewing the decision of a trial court that denied a defendant's request for post conviction DNA testing of "the victim's fingernail clippings." [6] The defendant had been convicted of killing his paramour, and the Commonwealth, during the trial, had produced evidence that established (1) that the defendant had been apprehended a few hours after the victim's body was found, and his clothes and the knife he was carrying "were stained with blood of the same type as the victim," [7] (2) that the defendant and the victim had been "involved in an abusive

---

**5.** While appellant in his brief actually presents four theories in support of his claim for DNA testing, his second and third claims are variations of the same overarching theory that the DNA testing of the available evidence could be compared with results retrievable from state and federal DNA data banks, which, in turn, could reveal the identity of the actual assailant. *See:* Brief of Appellant, p. 17.

**6.** *Commonwealth v. Smith,* 889 A.2d 582, 583 (Pa.Super.2005), *appeal denied,* 588 Pa. 769, 905 A.2d 500 (2006).

**7.** *Id.* at 586.

relationship," [8] (3) that the defendant had made prior threats "to kill the victim," [9] and (4) that "[s]emen found on the victim's leg matched that of [the defendant]," even though he had denied having sexual intercourse with the victim on the last night he said he saw her.[10] In light of this overwhelming evidence, this Court held that the defendant's post conviction request to perform DNA testing of the victim's fingernail clippings was "entirely speculative" and did not constitute a *"prima facie"* case warranting court-ordered DNA testing. *Id.* at 586.

The Court, in *Smith*, offered the following persuasive rationale in support of its decision:

> Appellant's entire argument depends upon an assumption for which there is no evidence in the record, *i.e.* that the victim scratched her assailant, thereby acquiring fragments of skin or droplets of blood from the assailant on her fingernails. Based on this assumption, appellant contends that the DNA profile obtained by testing the victim's fingernails will identify her assailant. In the absence of supporting evidence, we cannot accept appellant's premise. We have no evidentiary basis on which to infer that any DNA detected on the victim's fingernails was deposited there by her assailant during the fatal attack. Merely detecting DNA from another individual on the victim's fingernails, in the absence of any evidence as to how and when that DNA was deposited, would not exculpate appellant by pointing to a different assailant.
>
> To support his speculation that the assailant's DNA was deposited onto the victim's fingernails, appellant relies on the fact that the victim sustained defen-

sive wounds on her hands and fingers during the fatal attack by the knife-wielding assailant. From the defensive wounds, appellant infers that the victim tried to fight off her assailant by scratching him, thereby resulting in a deposition of the assailant's skin cells or blood on her fingernails. However, appellant's inference from the defensive wounds goes far beyond any testimony presented at trial. The forensic pathologist who conducted the autopsy of the victim's body testified that her defensive wounds indicated an attempt to protect the vital areas of her body, *e.g.* the neck, chest, and gut. In other words, according to the pathologist, "it's better to be stabbed in the hands rather than those [vital] areas." The testimony of neither the pathologist nor any other witness established that the victim attempted to fight off her assailant by scratching him.

*Id.* at 585–586 (citations omitted). Thus, on this record, the *Smith* panel held that the defendant could not satisfy his burden to demonstrate a prima facie case of actual innocence, as described in *Commonwealth v. Heilman, supra*. The Court, in *Smith*, also dismissed appellant's alternative argument for relief, in a footnote, based upon the following rationale:

> Appellant attempts to distinguish *Heilman* by arguing that he seeks to compare the DNA profile that may be detected on the victim's fingernails with state and national DNA databases to identify the victim's killer. Far from distinguishing *Heilman*, this argument only adds yet another layer of speculation to appellant's already speculative rationale for DNA testing.

*Id.* at 586 n. 6.

The Commonwealth seizes on that footnote to here contend that the Court, in

---

8. *Id.* at 587.

9. *Id.*

10. *Id.*

*Smith,* conclusively held that a DNA "data bank" argument is never available to a defendant who seeks to benefit from court-ordered DNA testing—an argument that was essentially accepted by the trial court. We, however, can not interpret that footnote so broadly. First, as previously stated, the language chosen by the *Smith* panel was clearly grounded in the facts of that case, where there was no evidence concerning how particles containing DNA might have been transferred to the hands of the victim.[11] Secondly, the *Smith* Court's rejection of the defendant's "data bank" argument, pronounced in the aforementioned brief footnote, was clearly supplementary to the Court's primary conclusion that the defendant had failed to demonstrate how the potential evidence that could be obtained from the victim's fingernails would negate the overwhelming evidence that the Commonwealth had produced at trial. Thus, we conclude that this Court's perfunctory dismissal of the data bank argument in *Smith,* was not the precedential holding of that case. Rather, it was a *sui generis* rejection of an alternative argument offered by that defendant, and its impact should be confined to the facts and circumstances of that case.

■ Here, by contrast, the evidence produced at trial, with the exception of the testimony of the jailhouse informant, was wholly circumstantial,[12] and there was no prior history between the parties that would have suggested the occurrence of the violent incident that resulted in the decedent's death. Moreover, the victim's hands were tied with a cloth that would have most likely been in contact with the assailant's hands,[13] and her clothing was ripped in such a way that indicated extensive contact with the hands of her assailant. Additionally, the investigators at the scene collected a multitude of sample material from the victim under the belief that she may have had contact with the skin of her assailant. Thus, there is no question that the development of additional evidence—evidence that can be easily obtained by DNA testing—will add to the reliability of the reconstruction of the events of that tragic day.

The question that we must here confront is whether, in this situation, the Pennsylvania DNA testing statute should be interpreted in such a way as to prevent the comparison of easily obtainable test results with known data banks for the purpose of determining the person responsible for the crime in question. To pose the question is to provide the answer, for in this evolving world of increased DNA data collections, and the increased reliance thereon by law

11. Although the Commonwealth stridently argues that there is no evidence that the victim in the instant case scratched her assailant, at trial the Commonwealth repeatedly presented argument and evidence to the jury that suggested that victim had scratched appellant. *See, e.g.:* N.T., September 21, 1987, pp. 18, 23, 25; N.T., September 22, 1987, pp. 391–392, 428–429. Thus, it is inconsistent for the Commonwealth to now attempt to preclude the testing of the fingernail evidence upon the argument that the evidence does not support the possibility that the victim scratched her assailant.

12. As we have noted, none of the laboratory results obtained from the FBI lab linked appellant to the victim. *See:* N.T., September 22, 1987, pp. 338–340. Moreover, the Commonwealth and defense counsel stipulated that neither appellant's hair nor clothing fibers were found on the victim. *Id.,* pp. 373–374. Nor did any of the fingerprints lifted from the scene match those of appellant. *Id.,* p. 374.

13. It bears remarking that in the case of *Commonwealth v. Lyons,* 833 A.2d 245 (Pa.Super.2003), *appeal denied,* 583 Pa. 695, 879 A.2d 782 (2005) the Commonwealth introduced evidence of the defendant's DNA that was obtained from a ligature that had been used to strangle the victim. *Id.* at 259.

enforcement agencies,[14] we should not summarily preclude defense counsel from using the data compiled in those "banks" to argue, in appropriate cases, that such evidence establishes the innocence of a person who has been charged or convicted of a crime.[15] This is especially so since the Act specifically provides for the proactive use of this information by the Commonwealth in an effort to find and prosecute persons whose identities are revealed by this information.[16] Moreover, the stated policy of the General Assembly, as provided in the statute that created the Pennsylvania DNA data bank, and authorized its cooperative use with other law enforcement data banks, compels such a result. It provides, *inter alia:*

> DNA banks are an important tool in criminal investigations, ***in the exclusion of individuals who are the subject of criminal investigations or prosecutions [.]***

44 Pa.C.S. § 2302(1) (emphasis supplied). Thus, this proactive use of available information that is already within the control of the Commonwealth is encouraged and even mandated by the General Assembly.[17]

■ To this end, the DNA testing statute, which was passed *unanimously* by the Pennsylvania General Assembly, should be regarded as a remedial statute and interpreted liberally in favor of the class of citizens who were intended to directly benefit therefrom, namely, those wrongly convicted of a crime. Such an interpretation is clearly supported by the legislative history of the Act,[18] which contains the follow-

---

14. The Courts of this Commonwealth have already accepted the use of data bank comparative analysis in the investigation of crimes. *See, e.g.: Commonwealth v. Mollett,* 5 A.3d 291, 296 (Pa.Super.2010). Moreover, nationwide there are a multitude of reported cases in which law enforcement agencies have used data bank information to solve crimes where the identification of the perpetrator was in question. *See, e.g.: State v. Duffy,* 2009 WL 249629 (Iowa App., 2009); *Shane v. Commonwealth of Kentucky,* 243 S.W.3d 336 (Ky.2007); *People v. Buie,* 285 Mich.App. 401, 775 N.W.2d 817 (2009), *appeal denied,* 485 Mich. 1105, 779 N.W.2d 81 (2010); *State v. McMilian,* 295 S.W.3d 537 (Mo.App., 2009); *State v. Notti,* 316 Mont. 345, 71 P.3d 1233 (2003); *Fain v. State,* 2009 WL 2579580 (Tex.App., Aug. 20, 2009); *Shore v. State,* 2007 WL 4375939 (Tex.Crim.App., Dec. 12, 2007). *See also: United States v. McNeill,* 2007 WL 2234516 (W.D.Pa., Aug. 2, 2007), *aff'd.,* 360 Fed.Appx. 363 (3rd Cir. 2010), *cert. denied,* — U.S. —, 130 S.Ct. 3304, 176 L.Ed.2d 1205 (2010).

15. The national data bank known as the Combined DNA Index System (CODIS), is a federal undertaking that supports criminal justice databases maintained by various law enforcement agencies throughout the United States of America. The CODIS Unit manages both the CODIS and the National DNA Index System (NDIS), and is responsible for "developing, providing and supporting the CODIS Program to federal, state and local crime laboratories in the United States and selected international law enforcement crime laboratories to foster the exchange and comparison of forensic DNA evidence from violent crime investigations." *See:* http://www.fbi.gov/about-us/lab/codis. As of November, 2010, CODIS has produced over 130,900 hits assisting in more than 127,600 investigations. *See:* http://www.fbi.gov/about-us/lab/codis/ndis-statistics.

16. The Pennsylvania DNA testing statute anticipates the ongoing retention of DNA test results, and specifically provides that data obtained from any DNA samples or test results can "be entered into law enforcement databases" for use "in the investigation of other crimes." 42 Pa.C.S. § 9543.1(g)(2). *See also:* 42 Pa.C.S. § 9543.1(c)(1)(iii).

17. We note that the effect of the enabling statute that created the Pennsylvania DNA data bank was apparently not raised by the defendant in *Smith,* and, consequently, not addressed by this Court in its decision. *See: Commonwealth v. Smith, supra.*

18. The Pennsylvania Statutory Construction Act provides in relevant part:

ing explicit statement of intent as provided by one of the sponsors of the Act, the esteemed Senator Stewart J. Greenleaf:

> This legislation would provide that [DNA] testing and provide a payment process for it and a process in which an individual could easily present their case, and a judge could then decide whether they would be allowed to have the testing or not, and they would be allowed to have it if the evidence would prove their innocence[.]
>
> \* .\* \*
>
> [T]here are occasions when DNA can convincingly establish the innocence of an individual. And so we will now join 13 other States in this nation that will provide for this process and *to make sure that we do not have anyone in our prisons or on death row who is innocent.*

Commonwealth of Pennsylvania Legislative Journal, June 19, 2001, pp. 745–746 (emphasis supplied). Thus, while it is certainly true that the General Assembly, in enacting the DNA testing statute, did not intend to encourage "fishing expeditions" or the needless expenditure of Commonwealth funds to pursue frivolous claims of innocence, it did seek to ensure the most fundamental principle of American jurisprudence, namely, that an innocent man not be punished for the crimes of another.

Consequently, under the facts of this case, we reverse the decision of the trial court denying appellant's request for DNA testing.

Order reversed. Case remanded for proceedings consistent with this Memorandum. Jurisdiction relinquished.

**§ 1921. Legislative intent controls**

(a) *The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly.* Every statute shall be construed, if possible, to give effect to all its provisions.

(b) When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit.

(c) *When the words of the statute are not explicit, the intention of the General Assembly may be ascertained by considering, among other matters:*

(1) The occasion and necessity for the statute.

(2) The circumstances under which it was enacted.

(3) The mischief to be remedied.

(4) The object to be attained.

(5) The former law, if any, including other statutes upon the same or similar subjects.

(6) The consequences of a particular interpretation.

(7) The contemporaneous legislative history.

(8) Legislative and administrative interpretations of such statute.

1 Pa.C.S. § 1921 (emphasis supplied).

**§ 1928. Rule of strict and liberal construction**

. . .

(c) All other provisions of a statute [not herein set out] *shall be liberally construed to effect their objects and to promote justice.*

1 Pa.C.S. § 1928(c) (emphasis supplied).