J-S19024-15

## NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| BENJAMIN CHAPMAN | |
| Appellant | No. 2286 EDA 2014 |

Appeal from the Order Dated May 29, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0804241-1993

BEFORE: STABILE, J., JENKINS, J., and MUSMANNO, J.

MEMORANDUM BY JENKINS, J.:                    **FILED APRIL 14, 2015**

The Commonwealth appeals from the order of the Philadelphia County Court of Common Pleas granting Benjamin Chapman's motion for post-conviction DNA testing. We affirm.

This Court summarized the facts as follows:

> [T]he evidence adduced at this trial was that on May 26, 1993, Eunice Bell, a neighbor of the decedent, Carol Davis [the "victim"], saw the [victim] and [Chapman], whom she knew to have a steady relationship with the [victim], walking together toward the area where the [victim's] body was discovered shortly thereafter. Celeste Brown, Ms. Bell's daughter, heard a hostile conversation between the [victim] and [Chapman] shortly before she heard the shot and found [victim's] body in the alleyway. Finally, Enika Davis, the decedent's 16-year-old sister, testified that on the night of the killing, [Chapman] came to their house, that he was angry and spoke of killing someone, that he took a gun out of his pants and threatened the [victim] with it, that the [victim] said she was going to the store and coming right back, that the [victim] and [Chapman] left the house together going toward the area from where

Enika Davis heard a gunshot and where [the victim] was found dead shortly thereafter.

These three witnesses testified that they did not see [Chapman] again after the shooting. Furthermore, the [victim's] father testified that although [Chapman] worked for him, he also did not see [Chapman] again until after his arrest some two months later.[1]

*Commonwealth v. Chapman*, 3981 Phila. 1994 (Pa.Super. filed Dec. 20, 1995) (quoting trial court opinion). In addition to the above-referenced evidence, the victim's neighbor, Oliver Turner, testified he saw Chapman and the victim on the night of her murder at approximately 11:30 or 12:30. N.T., 10/31/1994, at 106. However, he later saw the victim speaking with another female neighbor; he did not see Chapman. *Id.* at 107. Further, there was a sample of "fresh" type O blood collected from the crime scene. Motion for Post-Conviction Collateral Relief, dated May 14, 2003, at Exh. 1-B.[2]

_____

[1] The victim's father also testified that he spoke with Chapman on the morning following the murder and asked: "Man, what's up? Why did you kill my daughter?" N.T., 10/31/1994, at 43.

[2] Chapman maintains the type O blood sample did not match the victim's blood or his blood. Appellee's Brief at 11, 14; Exh. G, H, I. His blood type is type B. Appellant's Brief at Exh. I. The Commonwealth merely states that Chapman did not provide the victim's blood type. Appellant's Brief at 8.

In 2013, this Court summarized the case's procedural history on appeal from the denial of Chapman's fourth request for relief pursuant to the Post Conviction Relief Act ("PCRA")[3]:

On November 2, 1994, a jury found [Chapman] guilty of murder of the first degree and possessing an instrument of crime for the 1993 shooting death of his former girlfriend. On the following day, the trial court sentenced him to a term of life imprisonment and a consecutive two and one half to five years' imprisonment. This Court affirmed the judgment of sentence on December 20, 1995. ***Commonwealth v. Chapman***, 3981 PHL 1994 (unpublished memorandum) (Pa. Super. Dec. 20, 1995). [Chapman] did not file a petition for allowance of appeal in the Pennsylvania Supreme Court.

[Chapman], on January 17, 1996, filed a *pro se* PCRA petition, his first. The PCRA court appointed counsel, who filed an amended petition. The PCRA court denied the petition on June 3, 1997, without an evidentiary hearing. This Court affirmed the dismissal of [Chapman's] first PCRA petition on December 7, 1998, and the Pennsylvania Supreme Court denied allowance of appeal on April 7, 1999. ***Commonwealth v. Chapman***, 2764 PHL 1997 (unpublished memorandum) (Pa. Super. Dec. 7, 1998), *appeal denied*, 737 A.2d 1223 (Pa. 1999). Thereafter, [Chapman] filed a second *pro se* PCRA petition on March 29, 2000, which the PCRA court dismissed as untimely filed. This Court affirmed, and the Pennsylvania Supreme Court denied allowance of appeal. ***Commonwealth v. Chapman***, 1529 EDA 2001 (unpublished memorandum) (Pa. Super. June 19, 2002), *appeal denied*, 814 A.2d 675 (Pa. 2002). [Chapman's] third PCRA petition was filed *pro se* on April 28, 2003, and dismissed by the court as untimely on June 8, 2004. This Court affirmed, and the Pennsylvania Supreme Court denied allowance of appeal. ***Commonwealth v. Chapman***, 1904 EDA 2004

_____

[3] 42 Pa.C.S. §§ 9541-9546, et. al.

(unpublished memorandum) (Pa. Super. Feb. 11, 2005), *appeal denied* 882 A.2d 1004 (Pa. 2005).

[Chapman], on May 3, 2010, filed the instant PCRA petition *pro se*, his fourth, averring that he came into possession of newly discovered, exculpatory evidence. The PCRA court appointed counsel, who, on March 14, 2011, filed an amended petition. The counseled petition asserted, in relevant part, that: (1) [Chapman's] newly discovered evidence claim was not time barred; and (2) he was entitled to DNA testing under 42 Pa.C.S. § 9543.1. Following the filing of a motion to dismiss by the Commonwealth, the court issued a Pa.R.Crim.P. 907(1) notice of intent to dismiss on May 23, 2012, suggesting that [Chapman's] petition was untimely filed and that his issues were previously litigated. Appellant filed a response to the notice. The court, on July 2, 2012, dismissed the petition. This timely appeal followed.

*Commonwealth v. Chapman*, 2103 EDA 2012, at 1-3 (Pa.Super. filed Nov. 8, 2013) (unpublished memorandum).

This Court affirmed the PCRA court's denial of Chapman's newly-discovered evidence claim, but found the PCRA court erred in finding Chapman's request for DNA testing was previously litigated. *Chapman*, 2103 EDA 2012, at 4-10. We, therefore, remanded to the PCRA court for consideration of Chapman's request for post-conviction DNA testing.

On May 29, 2014, the PCRA court conducted a hearing and granted Chapman's request for DNA testing. The Commonwealth filed a timely notice of appeal. Both the Commonwealth and the PCRA court complied with Pennsylvania Rule of Appellate Procedure 1925.

The Commonwealth raises the following issue on appeal:

Did the lower court err in granting defendant's motion for post-conviction DNA testing where he failed to establish a

- 4 -

reasonable possibility that such testing would produce exculpatory evidence establishing his actual innocence?

Appellant's Brief at 2.

This Court has set forth the following standard of review of orders for post-conviction DNA testing:

> Post-conviction DNA testing falls under the aegis of the Pennsylvania Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541-9546, and thus, "[o]ur standard of review permits us to consider only whether the PCRA court's determination is supported by the evidence of record and whether it is free from legal error." Moreover, because the resolution of this appeal involves statutory construction, which involves a pure question of law, we review that aspect of the trial court's decision *de novo* and our scope of review is plenary.

*Commonwealth v. Conway*, 14 A.3d 101, 108 (Pa. Super. 2011) (citations omitted).

Pennsylvania's post-conviction DNA testing statute states, in relevant part:

> **(c) Requirements.--**In any motion under subsection (a), under penalty of perjury, the applicant shall:
>
> . . .
>
> (3) present a prima facie case demonstrating that the:
>
> (i) identity of or the participation in the crime by the perpetrator was at issue in the proceedings that resulted in the applicant's conviction and sentencing; and
>
> (ii) DNA testing of the specific evidence, assuming exculpatory results, would establish:
>
>> (A) the applicant's actual innocence of the offense for which the applicant was convicted;
>>
>> . . .
>
> **(d) Order.--**

. . .

(2) The court shall not order the testing requested in a motion under subsection (a) if, after review of the record of the applicant's trial, the court determines that there is no reasonable possibility that the testing would produce exculpatory evidence that:

(i) would establish the applicant's actual innocence of the offense for which the applicant was convicted[.]

. . .

42 Pa.C.S. § 9543.1.

The Commonwealth maintains the PCRA court erred because Chapman failed to establish that DNA testing would produce exculpatory evidence establishing actual innocence. Appellant's Brief at 10-17. We disagree.

The "actual innocence" requirement of section 9543.1 "requires that an appellant demonstrate that there is a 'reasonable possibility,' that 'favorable results of the requested DNA testing would establish the appellant's actual innocence of the crime of conviction." ***Commonwealth v. Conway***, 14 A.3d 101, 109 (Pa.Super.2011) (quoting ***Commonwealth v. Brooks***, 875 A.2d 1141, 1147 (Pa.Super.2005)) (internal footnotes and emphasis omitted). "[T]he newly discovered evidence must make it 'more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt.'" ***Id.*** (quoting ***Schlup v. Delo***, 513 U.S. 298, 327, 115 S.Ct. 851, 867, 130 L.Ed.2d 808, 836 (1995)). Therefore, we, as the reviewing court, must "make a probabilistic determination about what reasonable, properly instructed jurors would do" if presented with the new evidence. ***Id.*** (quoting ***Schlup***, 513 U.S. at 327). Further, courts must

review the "actual innocence of the offense" element by "assuming exculpatory results will be obtained from the proposed testing." *Conway*, 14 A.3d at 110.

Relying on *Commonwealth v. Smith*, 889 A.2d 582 (Pa.Super.2005), the Commonwealth maintains the lack of Chapman's DNA at the crime scene is too speculative to warrant DNA testing. Appellant's Brief at 12-17. In *Smith*, this Court found the trial court properly denied the defendant's request for DNA testing of the victim's fingernails where the defendant claimed the absence of his DNA from underneath the victim's fingernails would prove his innocence. The Court noted there was no evidence to establish the victim scratched her assailant. It further noted that "[m]erely detecting DNA from another individual on the victim's fingernails, in the absence of any evidence as to how and when that DNA was deposited, would not exculpate appellant by pointing to a different assailant." The Court found: "The statute does not contemplate the speculative type of argument advanced by appellant; rather it requires a *prima facie* case that the DNA results, if exculpatory, would establish appellant's actual innocence."

In *Conway*, this Court discussed the holding in *Smith*, noting:

> [T]he defendant [in *Smith*] had been convicted of killing his paramour, and the Commonwealth, during the trial, had produced evidence that established (1) that the defendant had been apprehended a few hours after the victim's body was found, and his clothes and the knife he was carrying "were stained with blood of the same type as the victim," (2) that the defendant and the victim had been "involved in an abusive relationship," (3) that the defendant had made prior threats "to kill the victim," and

(4) that "[s]emen found on the victim's leg matched that of [the defendant]," even though he had denied having sexual intercourse with the victim on the last night he said he saw her. In light of this overwhelming evidence, this Court held that the defendant's post conviction request to perform DNA testing of the victim's fingernail clippings was "entirely speculative" and did not constitute a "*prima facie*" case warranting court-ordered DNA testing.

*Conway*, 14 A.3d at 110-11 (internal footnotes and citations omitted).

The Commonwealth also relies on the following footnote from **Smith**, maintaining it defeats Appellant's argument that the DNA results could be compared with the national DNA databank:

Appellant attempts to distinguish [**Commonwealth v. Heilman**, 867 A.2d 542 (Pa.Super.2005)][4] by arguing that he seeks to compare the DNA profile that may be detected on the victim's fingernails with state and national DNA databases to identify the victim's killer. Far from distinguishing **Heilman***,* this argument only adds yet another layer of speculation to appellant's already speculative rationale for DNA testing.

**Smith**, 889 A.2d at 586 n. 6.

In **Conway**, this Court clarified the **Smith** footnote. *Conway*, 14 A.3d at 111 (citing **Smith**, 889 A.2d at 586 n. 6). We explained that this footnote did not establish a broad principle that a defendant could never seek a comparison to the DNA databank and we found the footnote's impact was confined to the facts of **Smith**. **Id.** at 112. The court in **Conway** noted:

_____

[4] In **Heilman**, this Court found the defendant failed to establish a *prima facie* case of actual innocence where he argued the absence of his DNA at the crime scene would exonerate him of the homicide.

The question that we must here confront is whether, in this situation, the Pennsylvania DNA testing statute should be interpreted in such a way as to prevent the comparison of easily obtainable test results with known data banks for the purpose of determining the person responsible for the crime in question. To pose the question is to provide the answer, for in this evolving world of increased DNA data collections, and the increased reliance thereon by law enforcement agencies, we should not summarily preclude defense counsel from using the data compiled in those "banks" to argue, in appropriate cases, that such evidence establishes the innocence of a person who has been charged or convicted of a crime. This is especially so since the Act specifically provides for the proactive use of this information by the Commonwealth in an effort to find and prosecute persons whose identities are revealed by this information. Moreover, the stated policy of the General Assembly, as provided in the statute that created the Pennsylvania DNA data bank, and authorized its cooperative use with other law enforcement data banks, compels such a result. It provides, *inter alia:*

> DNA banks are an important tool in criminal investigations, in the exclusion of individuals who are the subject of criminal investigations or prosecutions[.]

44 Pa.C.S. § 2302(1) (emphasis supplied). Thus, this proactive use of available information that is already within the control of the Commonwealth is encouraged and even mandated by the General Assembly.

To this end, the DNA testing statute, which was passed unanimously by the Pennsylvania General Assembly, should be regarded as a remedial statute and interpreted liberally in favor of the class of citizens who were intended to directly benefit therefrom, namely, those wrongly convicted of a crime. Such an interpretation is clearly supported by the legislative history of the Act, which contains the following explicit statement of intent as provided by one of the sponsors of the Act, the esteemed Senator Stewart J. Greenleaf:

> This legislation would provide [DNA] testing and provide a payment process for it and a process in

which an individual could easily present their case, and a judge could then decide whether they would be allowed to have the testing or not, and they would be allowed to have it if the evidence would prove their innocence[.]

* * *

[T]here are occasions when DNA can convincingly establish the innocence of an individual. And so we will now join 13 other States in this nation that will provide for this process and to make sure that we do not have anyone in our prisons or on death row who is innocent.

Commonwealth of Pennsylvania Legislative Journal, June 19, 2001, pp. 745–746 (emphasis supplied). Thus, while it is certainly true that the General Assembly, in enacting the DNA testing statute, did not intend to encourage "fishing expeditions" or the needless expenditure of Commonwealth funds to pursue frivolous claims of innocence, it did seek to ensure the most fundamental principle of American jurisprudence, namely, that an innocent man not be punished for the crimes of another.

*Conway*, 14 A.3d at 113-114 (emphasis deleted).

In *Smith*, it was unclear whether there was any DNA to test and there was direct evidence of the defendant's guilt. Here, in contrast, there was no direct evidence linking Chapman to the crime. Additionally, there was "fresh" blood at the crime scene location that Chapman maintains did not belong to him or the victim. The Commonwealth does not dispute this.[5] However, it is unlikely that someone not involved in the altercation with the victim would have left "fresh" blood at the crime scene, and testing the type

---

[5] Our review of the record does not reveal whether it is the victim's blood.

O blood stain to determine whether the blood was from the victim or whether it matches an individual in the DNA database could reveal evidence that could have a significant effect on the conclusion of a reasonable, properly instructed juror. *See Conway*, 14 A.3d at 109. Therefore, under our standard of review, we find the PCRA court did not err in ordering DNA testing.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/14/2015