J-S40005-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: JOHN MARSHALL PAYNE, III | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: COMMONWEALTH OF PENNSYLVANIA | |
| | No. 1113 MDA 2013 |

Appeal from the Order Entered May 22, 2013
In the Court of Common Pleas of York County
Criminal Division at No(s): CP-67-MD-1000291-1986

BEFORE: BENDER, P.J.E., BOWES, J. and PANELLA, J.

MEMORANDUM BY BENDER, P.J.E.:                **FILED OCTOBER 03, 2014**

This case involves a Commonwealth appeal from the PCRA[1] court's order granting a request filed by Appellee, John Marshall Payne, III, for DNA testing pursuant to 42 Pa.C.S. § 9543.1. The Commonwealth contends that the court erred, as a matter of law, in determining that such testing would produce exculpatory evidence that would establish Appellee's actual innocence. After careful review, we affirm on the basis set forth in the PCRA court's opinion.

On August 22, 1986, Appellee was found guilty of second-degree murder, aggravated assault, burglary, and conspiracy. A brief summary of the facts are in order: On December 17, 1981, the 90 year-old victim in this case, Elsie Rishel, was found dead by family members. The victim had died in her bed as a result of blunt force trauma to the head. There was evidence

---

[1] Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541–9546.

found at the scene that was consistent with a break-in and robbery. However, no physical evidence directly tied Appellee to the crime. Fingerprints were recovered from the scene, but none matched Appellee or those alleged to be his co-conspirators. Consequently, Appellee's conviction was premised on the testimony of several Commonwealth witnesses that Appellee made inculpatory statements to them concerning the murder. Although their testimony regarding Appellee's purported inculpatory remarks was consistent in broad strokes,[2] there were significant details that varied among the witnesses.[3] There were also credibility problems with each of these key Commonwealth witnesses. Nevertheless, based on their testimony, a jury convicted Appellee of the above-mentioned offenses. On March 23, 1987, the trial court sentenced Appellee to a mandatory term of life in prison.

On June 14, 2012, Appellee filed a *pro se* PCRA petition seeking DNA testing pursuant to 42 Pa.C.S. § 9543.1. The PCRA court appointed counsel to represent him, and a hearing was held on the matter on February 19, 2013. On May 23, 2013, the court granted Appellee's request for DNA

_____

[2] Their testimony was consistent in that they claimed that Appellee had stated that he was accompanied by two others during the home invasion, and that the victim's phone was used as the murder weapon.

[3] Their testimony was inconsistent in regard to Appellee's degree of culpability in the murder itself and with respect to the identity of his co-conspirators.

testing. The Commonwealth filed a timely notice of appeal and complied with the PCRA court's order to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal. The PCRA court then issued its Rule 1925(a) opinion on August 15, 2013. The Commonwealth now presents the following question for our review:

> Whether the court below erred as a matter of law in determining that DNA testing would produce exculpatory evidence that would establish [Appellee's] actual innocence?

Commonwealth's Brief at 4 (unnecessary capitalization omitted).

"Post conviction DNA testing falls under the aegis of the [PCRA], and thus, '[o]ur standard of review permits us to consider only whether the PCRA court's determination is supported by the evidence of record and whether it is free from legal error.'" *Commonwealth v. Conway*, 14 A.3d 101, 108 (Pa. Super. 2011). After careful review of the record, the Commonwealth's brief, Appellee's brief, the PCRA court's Rule 1925(a) opinion, as well as the applicable statutes and relevant case law, we conclude that the PCRA court's order granting Appellee's request for DNA testing is "supported by the evidence of record" and "free from legal error." *Id.* Accordingly, we adopt the PCRA court's well-reasoned Rule 1925(a) opinion as our own and affirm on that basis. Nevertheless, a bit of clarification is in order.

As noted in the trial court's opinion, there were factors in this case that weighed in favor of granting Appellee's request for DNA testing, and factors that weighed against granting that request. The circumstances of the crime at issue suggest that if testing of physical evidence collected from

the scene were to reveal someone else's DNA (other than Appellee's), such evidence would not prove Appellee's actual innocence in a literal sense. The Commonwealth contends that this factor is controlling. However, "actual innocence" is a misleading recitation of the standard.[4] The appropriate standard is whether "the newly discovered evidence must make it 'more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt.'" *Conway*, 14 A.3d at 109 (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). Furthermore, the governing statute directs our courts *to assume that the results from the proposed DNA testing are exculpatory* when considering the impact of such results on a reasonable juror. 42 Pa.C.S. § 9543.1(c)(3)(ii). In other words, a court must consider the best case scenario for the petitioner from the proposed DNA testing and

_____

[4] Indeed, it is unlikely that DNA evidence could ever demonstrate "actual innocence" in any case, or under any circumstances. For instance, even in the case of an alleged rape, discovering DNA other than that of the accused or the victim in a rape kit collected from the victim does not prove "actual innocence" in a literal sense. Such evidence would only serve to undermine the credibility of evidence supporting the accused's guilt; it would not affirmatively prove innocence. This is because the presence of someone else's DNA could be explained by circumstances unrelated to the rape itself. Ultimately, DNA evidence serves only to support or undermine the theories of the prosecution, or the defense, and the credibility of evidence, physical, testimonial, or circumstantial, supporting those theories.

Nevertheless, no one can seriously doubt the applicability of the DNA statute where the petitioner was convicted of committing a forcible rape after asserting a wrongful identification defense, even if the foreign DNA discovered in a rape kit could not literally prove his innocence. It is enough that such evidence would likely change the mind of a reasonable juror who would otherwise have found him guilty.

consider whether that result, if available to a jury, would make it more likely than not that no reasonable juror would have found him guilty.

In this case, the PCRA court determined that such a result was possible and, therefore, that it was appropriate to order DNA testing. The crux of the Commonwealth's argument turns upon two assumptions that, at the end of the day, were rejected by the PCRA court. First, the Commonwealth appears to contend that exculpatory evidence is not attainable in this case. That argument, however, is dependent on a misinterpretation of the "actual innocence" standard – that "actual innocence" must be proven affirmatively. That interpretation is simply wrong. The standard is whether the results of the testing make it "more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt." **Conway**, **supra**.

The second prong of the Commonwealth's argument is that "[j]urors in the instant case found the totality … of [the] evidence to be so compelling that it convinced them of [Appellee's] guilt beyond a reasonable doubt." Commonwealth's Brief at 21. This is unconvincing for two reasons. First, and foremost, it is illogical bootstrapping. Every petitioner seeking relief under the DNA statute had a jury (or judge) determine that they were guilty beyond a reasonable doubt. That fact has absolutely no bearing on the question of whether, presented with *new* evidence, a reasonable juror would have concluded differently.

Second, the Commonwealth's characterization of the evidence of guilt in this case as "compelling" is not an objective conclusion. Appellee's conviction was based upon the testimony of witnesses who did not observe the crime in question. Instead, these witnesses purportedly heard Appellee make inculpatory statements. While such evidence is sufficient to support Appellee's conviction, that does not make it "compelling" or overwhelming evidence of his guilt. Although there was physical evidence collected at the scene of the crime, none of that evidence served to link Appellee to the crime or otherwise corroborate the testimony of the Commonwealth's witnesses, but for the following.

The Commonwealth suggests that what makes the witnesses testimony particularly compelling is the fact that Appellee purportedly acknowledged the use of the phone as the murder weapon in the conversations relayed by the Commonwealth's witnesses, a possibility that had not been made public at the time Appellee purportedly made his inculpatory statements. However, the trial court notes that evidence was presented to support the theory that the witnesses learned of that detail from an investigating officer prior to giving their statements, rather than from conversations with Appellee. Furthermore, although there was testimony that the victim's wounds were consistent with having been beaten with the phone, there was no testimony or evidence demonstrating that the phone was actually used for that purpose, such as evidence of the victim's blood or tissue on the phone.

Given the fact that the Commonwealth's case rested so strongly on the testimony of witnesses who were not even witnesses to the crime itself, there is a reasonable probability that certain DNA evidence, unavailable at the time of trial, could have altered the credibility assessment made by a reasonable juror. Although the PCRA court does not elaborate on what such a result would look like, we have no trouble imagining such a scenario. For instance, if the DNA profile of one of the Commonwealth's witnesses was discovered among the physical evidence to be tested, such a result would certainly call into question that witness's credibility above and beyond their preexisting credibly problems. It would also explain their familiarity with the likely murder weapon and demonstrate a motive to inculpate Appellee. In a case where the evidence was not overwhelming, such a result could have had a significant effect in changing the mind of a reasonable juror with regard to whether the Commonwealth met its burden in demonstrating Appellee's guilt beyond a reasonable doubt.

The question for the PCRA court was not whether attaining favorable DNA results for Appellee is a likely result of testing. The question was whether exculpatory results, if found, would make it "more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt." **Conway**, **supra**. The PCRA court determined that Appellee met this burden, and we ascertain that its conclusion is both supported by the evidence of record and free of legal error.

Order **affirmed**.

Judge Panella joins the memorandum.

Judge Bowes files a dissenting memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/3/2014

IN THE COURT OF COMMON PLEAS OF YORK COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH :
:
v. : NO. CP-67-MD-1000291-1986
:
JOHN PAYNE, :
Defendant/Appellant :

COUNSEL OF RECORD:

Duane A. Ramseur, Esquire       William H. Graff, Esquire
Counsel for the Commonwealth     Counsel for Defendant

## OPINION IN SUPPORT OF ORDER PURSUANT TO RULE 1925(a) OF THE RULES OF APPELLATE PROCEDURE

The Court received a Notice of Appeal, docketed on June 18, 2013, that the Commonwealth appeals to the Superior Court of Pennsylvania this Court's Order issued May 22, 2013. The Court has reviewed the record. The Court now issues this Opinion in support of the Order dated May 22, 2013.

### Procedural History

On August 22, 1986, the Defendant was found guilty of second-degree murder, conspiracy, aggravated assault, and burglary. The Defendant entered a plea of guilty to an unrelated charge of robbery on September 5, 1986. On April 30, 1993, the Superior Court remanded to this Court to vacate the judgment of sentence for conspiracy, burglary, and robbery. A new sentence for robbery was then legally imposed. The Defendant pursued his direct appeal rights and subsequently filed petitions under the Post-Conviction Relief Act.

1

Though Defendant's rights to appeal and to file PCRAs have long-since expired, the Defendant filed a petition requesting DNA testing under 42 Pa.C.S.A. § 9543.1, which allows for such a petition to be filed beyond the normal time barriers for after-discovered evidence that may be tested for DNA. This petition meets that exception.

A hearing was held on April 19, 2013 to hear argument on Defendant's PCRA petition. At the conclusion of that hearing, this Court reserved its decision. On May 22, 2013, this Court issued an order granting the Defendant's petition. The Commonwealth then filed a timely appeal on June 18, 2013.

Commonwealth's Appeal is based upon the following reasons. First, that this Court abused its discretion in granting the Defendant's petition because the Defendant failed to present a prima facie case demonstrating actual innocence. Second, this Court erred as a matter of law in incorrectly applying the actual innocence standard. Third and finally, this Court erred in granting the Defendant's petition not for reasons of the Defendant meeting the actual innocence standard, but, rather, in order for the Commonwealth to identify uncharged coconspirators.

II.   **Facts**

In the present case, there was no physical evidence tying the Defendant to the crime (Notes of Testimony, 8/20/86, at 442, 457). The murder weapon could not be positively identified and the only fingerprints present were family members'—with the exception of a print on the window, which, as to the Defendant, was negative. (N.T., 8/20/86, at 443 and

2

445-49.) Moreover, a palm-print found on the putative murder weapon, a phone, did not match the Defendant's, nor one of the Defendant's purported, but uncharged, co-assailants, Daniel Everett. (N.T., 8/20/86, at 467.)

An Officer Garber testified that on March 25, 1983 the Defendant complained to the officer that a state trooper was accusing the Defendant of beating a woman to death with a phone. (N.T., 8/20/86, at 471.) The state trooper in question then testified that in March of 1983 he had not told anyone of a suspicion that a phone was the murder weapon, nor did he even suspect, at that time, that a phone was the object used to inflict blunt force trauma on the victim. (N.T., 8/20/86, at 474-75.) When the Defendant took the stand and was questioned as to how he knew of the phone, he said that he first heard about the phone after another of Commonwealth's witnesses had informed him of it. (N.T., 8/21/86, at 637-38.) Following the trooper's testimony, the Commonwealth put on three witnesses who claimed the Defendant confessed his role in the murder to each of them individually.

Deborah Wallick testified that the Defendant told her that he and two others went to the victim's home to commit a robbery; however, during the course of that robbery, the Defendant saw the victim being beaten with a telephone. (N.T., 8/21/86, at 481.) Wallick stated that the Defendant told her he then fled the scene. ((N.T., 8/21/86, at 481.) Wallick said the Defendant told her that his accomplices were two males. (N.T., 8/21/86, at 488.) Wallick's testimony was, however, impeached. Under questioning, Wallick admitted that

3

she had previously been convicted of hindering prosecution. (N.T., 8/21/86, at 489.) Wallick was unsure of when and where the supposed confession occurred and testified that she had previously told the defense attorney that she was unsure whether the Defendant made the statements she alleged. (N.T., 8/21/86, at 490.) Moreover, Wallick admitted to heavy drug use including usage of LSD at the time that the confession would have occurred. (N.T., 8/21/86, at 491.)

The second witness who testified that the Defendant confessed to participating in the murder was Sonny Olgesby. Facing third-degree murder charges of his own, Olgesby admitted that his testimony against the Defendant was an added requirement to Olgesby's plea deal to turn on his own co-defendants. (N.T., 8/21/86, at 520-21.) Olgesby went on to testify that the Defendant volunteered to him that the Defendant had killed the victim himself. (N.T., 8/21/86, at 523-24.) In contrast to Wallick's assertion that the Defendant told her that two men were his co-conspirators, Olgesby claimed the Defendant told him that "Danny Edwards" and the Defendant's girlfriend Melody went to the victim's house to rob her. [1] (N.T., 8/21/86, at 525.) Olgesby said that he was never told what the implement of murder was, but that the Defendant did confess. (N.T., 8/21/86, at 525.) This was contradicted by William Jones, a defense witness, who said that Olgesby told him that one of the investigating officers had provided Olgesby with his information about the case,

---

[1] Whether "Danny Edwards" equated to "Daniel Everett," who testified later, is a question we must assume the

4

including that a telephone was possibly used to kill the victim. (N.T., 8/21/86, at 590.) Finally, Olgesby testified that he did not know Wallick. (N.T., 8/21/86, at 544.)

The Commonwealth also put on the testimony of Chris Gibson who said that the Defendant confessed to him as well. Gibson says that the Defendant told him that the crime was committed by the Defendant and two others, one of whom was named "Danny." (N.T., 8/21/86, at 546.) The Defendant supposedly confessed that it was he who had inflicted blows upon the victim with a telephone. (N.T., 8/21/86, at 548.) Like Olgesby, Gibson received a plea deal for his testimony. (N.T., 8/21/86, at 550-51.) Gibson's testimony was impeached by Wendall Murray who stated that Gibson had a long conversation with Olgesby before approaching authorities with the information he supposedly garnered from the Defendant. N.T., 8/21/86, at 581.) William Jones also connected Gibson to Olgesby. This means that the jury heard evidence tending to imply that perhaps Olgesby was Gibson's actual source of information regarding the murder and the Defendant's possible role in it.

On the final day of testimony, the jury heard from Daniel Everett. As stated earlier, Everett was purported to have been one of the Defendant's co-assailants who was not charged. Everett testified that, prior to trial; he did not know the Defendant. (N.T., 8/22/86, at 660.) Under cross-examination, Everett conceded what should have been a readily verifiable fact that Everett's sister-in-law's home, where Everett may-or-may-not have ever

ury resolved.

5

spent the night, was on a street that is but two blocks from the street on which the victim's home was situated. (N.T., 8/22/86, at 661-62.)

## II. Matters Complained of on Appeal

### A. Actual Innocence

The Defendant petitioned for DNA evidence, gathered from the crime scene, to be tested under the authority granted to this Court by 42 Pa.C.S.A. § 9543.1 of the Post-Conviction Relief Act. The potential DNA evidence to be tested is hair and blood samples gathered from the crime scene connected to Defendant's case.

The first applicable portion of 42 Pa.C.S.A. § 9543.1(a) states that:

> (1) An individual convicted of a criminal offense in a court of this Commonwealth and serving a term of imprisonment or awaiting execution because of a sentence of death may apply by making a written motion to the sentencing court for the performance of forensic DNA testing on specific evidence that is related to the investigation or prosecution that resulted in the judgment of conviction.

> (2) The evidence may have been discovered either prior to or after the applicant's conviction. The evidence shall be available for testing as of the date of the motion. If the evidence was discovered prior to the applicant's conviction, the evidence shall not have been subject to the DNA testing requested because the technology for testing was not in existence at the time of the trial or the applicant's counsel did not seek testing at the time of the trial in a case where a verdict was rendered on or before January 1, 1995, or the applicant's counsel sought funds from the court to pay for the testing because his client was indigent and the court refused the request despite the client's indigency.

6

In this case, the Petitioner is serving a term of imprisonment and was found guilty on August 22, 1986, so the petition clears this first hurdle. Secondly, and directly related to Commonwealth's first and second matters complained of, 42 Pa.C.S.A. § 9543.1(c)(3)(i) and 42 Pa.C.S.A. § 9543.1(c)(3)(ii)(A) state that a petitioner, under this section, must:

> [P]resent a *prima facie* case demonstrating that the:
>
> (i) identity of or the participation in the crime by the perpetrator was at issue in the proceedings that resulted in the applicant's conviction and sentencing; and
>
> (ii) DNA testing of the specific evidence, assuming exculpatory results, would establish:
>
> (A) The applicant's actual innocence of the offense for which the applicant was convicted[.]

Finally, 42 Pa.C.S.A. § 9543.1(d)(2) and subsection (i) state that::

> The court shall not order the testing requested in a motion under subsection (a) if, after review of the record of the applicant's trial, the court determines that there is no reasonable possibility that the testing would produce exculpatory evidence that:
>
> (i) would establish the applicant's actual innocence of the offense for which the applicant was convicted[.]

In *Commonwealth v. Conway*, the Superior Court of Pennsylvania said that,

> [A]s this Court has previously summarized, on its face, the *prima facie* requirement set forth in § 9543.1(c)(3) and reinforced in § 9543.1(d)(2) requires that an appellant demonstrate that there is a "reasonable possibility," that "favorable results of the requested DNA testing 'would establish' the appellant's actual innocence of the crime of conviction."

7

14 A.3d 101, 109 (Pa. Super. Ct. 2011) (citing *Commonwealth v. Brooks*, 875 A.2d 1141, 1147 (Pa. Super. Ct. 2005), quoting *Commonwealth v. Heilman*, 867 A.2d 542, 546-547 (Pa. Super. Ct. 2005), (citation omitted) (emphasis in *Heilman*)). The *Conway* court goes on to say that the definition of "actual innocence" is,

> that the newly discovered evidence must make it "more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt." Thus, this standard requires a reviewing court to "make a probabilistic determination about what reasonable, properly instructed jurors would do," if presented with the new evidence.

14 A.3d 101, 109 (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)). In other words, a second summation of the standard would be, what does a court believe that jurors would decide if they were to hear the case anew and with the inclusion of the results of the requested DNA testing? Whether or not the results of the testing are likely to be exculpatory is immaterial as, "the statutory language requires reviewing courts to evaluate the 'actual innocence of the offense' component by 'assuming exculpatory results' will be obtained from the proposed testing." *Conway*, 14 A.3d 101, 110 (citing 42 Pa.C.S. § 9543.1(c)(3)(ii)).

### i. *Defendant's Burden to Present a Prima Facie Case of Actual Innocence*

The Commonwealth first argues that this Court abused its discretion in granting the Defendant's petition. Specifically, the Commonwealth argues that the Defendant failed to present a *prima facie* case that demonstrates his actual innocence.

8

Based on the relevant law cited *supra*, in order for the Defendant to meet his burden of presenting a *prima facie* case that demonstrates his actual innocence the Defendant needed to demonstrate that there was a reasonable possibility that favorable results would establish his actual innocence. And actual innocence is found where newly discovered evidence establishes that it is more likely than not that no reasonable juror would convict the defendant beyond a reasonable doubt. It is, then, the court's job to weigh the proffered evidence. The petitioner's burden is thus met after the petitioner presents the court with newly discovered evidence and an argument that there is a reasonable possibility a jury would have reacted differently with the proffered evidence.

As was mentioned in this Court's Opinion in Support of Order issued May 22, 2013, the Defendant put forward a "data bank" theory for why the DNA evidence in his case should be tested. (Post Conviction Relief Act Petition, 6/14/12, at unnumbered pages 4-5.) The Defendant also stated his belief that his conviction rested upon nothing more than the testimony of a jailhouse snitch. (PCRA Petition, 6/14/12, at unnumbered page 12.) This assertion was reiterated at the April 19, 2013 hearing. (Notes of Testimony, 4/19/13, at 21.) At the April 19, 2013 hearing, the Defendant asserted that the results of DNA testing, when submitted alongside the other evidence presented at trial, would establish his innocence. (Notes of Testimony, 4/19/13, at 6-7.) This Court believes the Defendant presented newly discovered evidence and an argument that reasonable jurors would have acted differently

9

with the addition of DNA evidence. As the Defendant did make a *prima facie* case that he is actually innocent, this Court respectfully submits that it did not abuse its discretion.

2.      *Application of the Actual Innocence Standard*

The Commonwealth's second matter complained of is that this Court erred as a matter of law by incorrectly applying the actual innocence standard.

As the recitation of law above details, the Defendant must demonstrate a reasonable possibility that favorable DNA testing results would establish his actual innocence. And actual innocence is established where a court determines that newly discovered evidence makes it "more likely than not that no reasonable juror would have found the Defendant guilty beyond a reasonable doubt." *Commonwealth v. Conway*, 14 A.3d 101, 109 (Pa. Super. Ct. 2011) (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)). The PCRA court, then, must weigh the new evidence against the evidence that was presented against the Defendant previously and decide whether reasonable, properly instructed, jurors would have reached a different conclusion as a result of the new evidence. And that is what this Court attempted to do with the Defendant's petition when it was *sub judice*.

To begin with, Defendant encounters the same problem dealt with in *Commonwealth v. Smith*. In *Smith*, the defendant's case for testing of fingernail clippings from the victim, under the assumption the victim had scratched the true perpetrator, was held to be too speculative in that there was no evidence presented at the trial to indicate such scratching occurred. 889 A.2d 582, 585-86 (Pa. Super. Ct. 2005).

10

In the Defendant's case, there is also a dearth of evidence in the record as to how the evidence sought to be tested was deposited at the murder scene. It is clear that the Defendant believes that by virtue of the victim's murder being violent that there must have been a struggle which could have led to the depositing of DNA. This, however, is even less substantive than the theory put forward by the Defendant in *Smith*. And yet, the Defendant should probably not be barred from testing as the *Smith* Defendant was. In wrestling with the same issue as that presented in *Smith*, the *Conway* Court noted that the Investigators in that case, "collected a multitude of sample material from the victim under the belief that she may have had contact with the skin of her assailant" and that,

> there is no question that the development of additional evidence—evidence that can be easily obtained by DNA testing—will add to the reliability of the reconstruction of the events of that tragic day.

14 A.3d 101, 112. The investigators in the present case, despite testifying that there was no physical evidence to present at trial, did, nonetheless, collect evidence and send it to the FBI for analysis. Testing those portions of that evidence that avail themselves to DNA testing will add to the reliability of the reconstruction of the events.

The testimony of the two jailhouse informants, Olgesby and Gibson is suspect if only because they each received deals from the Commonwealth in exchange for their testimony. Wallick's testimony, however, buttressed the jailhouse informants in that she supposedly did not know them and yet, on the whole, the details of the confessions were remarkably similar.

11

This could have been the result of officer impropriety and sharing of Wallick's information with the jailhouse informants and there was testimony to that effect. Moreover, Wallick herself was a witness whose testimony was impugned by a prior conviction for hindering prosecution, her wavering on details, and her prior drug usage. A jury might indeed have placed more emphasis on the weaknesses of Commonwealth's case if there were DNA evidence introduced and it did not directly tie the Defendant to the murder scene.

Though it is true that some, or perhaps even many, requests for the testing of DNA are frivolous, that does not mean it is so in this case. And perhaps the scales of justice should be tipped in favor of testing. Such a sentiment was expressed by the *Conway* Court when it wrote:

> [W]hile it is certainly true that the General Assembly, in enacting the DNA testing statute, did not intend to encourage "fishing.expeditions" or the needless expenditure of Commonwealth funds to pursue frivolous claims of innocence, it did seek to ensure the most fundamental principle of American jurisprudence, namely, that an innocent man not be punished for the crimes of another.

14 A.3d 101, 114.

Considering all of the above that is both for and against testing, the very best reason to test the evidence is the fact that the witnesses who testified regarding confessions all agreed on one salient point, namely, that there were three individuals who perpetrated the robbery that night. As such, DNA testing, in this case, may result in additional charges and

12

bringing to justice *all* guilty parties. Perhaps it would be a perversion of the PCRA statute, as it relates to DNA, if the Defendant's request were to be granted, under the auspices of a statute designed to aid the wrongly convicted, in order to further Commonwealth's own interests. However, it is curious indeed that Commonwealth's position at Defendant's trial was that there were three intruders into the victim's home, but that no testing should be done on available evidence when two of those intruders remain unknown and potentially on the loose. In point of fact, were the Commonwealth to appeal a ruling in favor of testing it might be inadvertently aiding other perpetrators to escape responsibility.

Since there was no physical evidence presented at trial against the Defendant and as a result of the evidence of confessions being of questionable fidelity, it is, "more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt." Having weighed the newly discovered evidence against that which was presented at trial and found it more likely than not that a different outcome would occur, this Court granted the Defendant's petition. This Court believes that it correctly applied the actual innocence standard and did not, therefore, err as a matter of law. As such, this Court respectfully requests that its decision be affirmed.

B.    Uncharged Coconspirators

The Commonwealth's third and final complaint is that it believes this Court did not grant the Defendant's petition on its merits; but, rather, to reveal the identities of uncharged

13

coconspirators. This Court believes that the Commonwealth may have reached such an understanding from a misreading of this Court's opinion.

Were the discovery of potential coconspirators *the* reason why this Court granted the Defendant's petition then this Court would be compelled to agree with the Commonwealth's conclusion that there was an error of law. However, as the Court believes that there were other, proper, grounds for granting the Defendant's petition, this Court does not believe there was any error. This Court would emphasize that the concluding paragraph of the Opinion in Support of Order summarized the grounds upon which our decision rested. The Court wrote,

> Since there was no physical evidence presented at trial against the Defendant and as a result of the evidence of confessions being of questionable fidelity, it is, "more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt."

There is no mention of searching for uncharged coconspirators. As such, this Court maintains that it did not grant the Defendant's petition based upon a desire to identify coconspirators. We respectfully request affirmance.

Alternatively, if there was error, this Court humbly submits that it was harmless error in drafting the opinion. In point of fact, this Court sought to alleviate any confusion that might result from including that portion of the opinion which Commonwealth finds objectionable by alluding to the possible impropriety of granting the Defendant's motion based upon a desire to reveal uncharged coconspirators. In labeling the identification of uncharged coconspirators "the very best reason to test the evidence," this Court was perhaps

14

too careless with language. At the time of drafting, this Court believed it was obvious that the best reason for taking action is not synonymous with the legally correct reason for that same action. Those reasons which the court felt were the legally correct reasons undergirding the order were provided in the concluding paragraph for emphasis. This Court strives for clarity, but recognizes that it may have inadvertently caused confusion. If there was confusion, this Court maintains that it was harmless error and deferentially requests affirmance.

## IV. Conclusion

Based upon the reasons stated above, this Court respectfully urges affirmance of the certification, conviction, and sentence of the Defendant.

BY THE COURT,

DATED: August 14, 2013

MICHAEL E. BORTNER, JUDGE

15

IN THE SUPERIOR COURT OF PENNSYLVANIA
MIDDLE DISTRICT

| COMMONWEALTH of Pennsylvania, Appellant, | : |  |
|---|---|---|
| | : | 1113 MDA 2013 |
| v. | : | |
| | : | |
| John Marshall PAYNE, III, Appellee. | : | CP-67-MD-1000291-1986 |
| | : | |

PROOF OF SERVICE

I hereby certify that I am this day serving the foregoing document upon the persons and in the manner indicated below which service satisfies the requirements of Pa. R.A.P. 121:

Service by first class mail addressed as follows:
Karen Reid Bramblett, Prothonotary
Pennsylvania Judicial Center
601 Commonwealth Ave., Suite 1600
PO Box 62435
Harrisburg, PA 17106-2435
(717) 772-1294

William Graff, Esq.
109 East Market Street
York, PA 17401
(717) 845-5577
Attorney for Defendant

Date: 10/30/13

Duane Ramseur, Senior Deputy Prosecutor
Supreme Court Id. No. 206123
York County Office of the District Attorney
York County Judicial Center
45 North George Street
York, Pennsylvania 17401
Phone: (717) 771-9600
Attorney for the Commonwealth

C