J-S53034-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| Appellee | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| TYUAN SIMON | : | |
| | : | |
| Appellant | : | No. 3204 EDA 2017 |

Appeal from the PCRA Order September 12, 2017
In the Court of Common Pleas of Montgomery County
Criminal Division at No(s):  CP-46-CR-0007840-2012

BEFORE:   GANTMAN, P.J., OTT, J., and PLATT*, J.

MEMORANDUM BY GANTMAN, P.J.:          **FILED FEBRUARY 26, 2019**

Appellant, Tyuan Simon, appeals from the order entered in the Montgomery County Court of Common Pleas, which denied Appellant's first petition brought under the Post Conviction Relief Act ("PCRA").[1]  We affirm.

The relevant facts and procedural history of this case are as follows. During a grand jury hearing on July 18, 2012, Christopher Carbone testified another prison inmate had told Mr. Carbone that Appellant had hired the inmate to kill Victim.  Subsequently, the Commonwealth charged Appellant with first-degree murder and related offenses arising out of the shooting death of Victim.  Appellant proceeded to a multi-day jury trial on June 24, 2013.  At trial, Mr. Carbone recanted his grand jury testimony, indicating, *inter alia*: (i) his attorney had coerced him to testify at the grand jury

_____

[1] 42 Pa.C.S.A. §§ 9541-9546.

_____

*   Retired Senior Judge assigned to the Superior Court.

hearing, because he led Mr. Carbone to believe the Commonwealth would pursue a lesser sentence against Mr. Carbone in his pending criminal case if he testified; and (ii) after the grand jury hearing, someone had threatened to harm Mr. Carbone and his family if he testified against Appellant at trial. On June 27, 2013, a jury convicted Appellant of first-degree murder, solicitation to commit murder, and conspiracy to commit murder. The court sentenced Appellant on September 20, 2013, to life without the opportunity of parole ("LWOP"). This Court affirmed the judgment of sentence on December 12, 2014, and our Supreme Court denied allowance of appeal on May 13, 2015. *See Commonwealth v. Simon*, 116 A.3d 686 (Pa.Super. 2014) (unpublished memorandum), *appeal denied*, 632 Pa. 662, 116 A.3d 604 (2015).

On May 3, 2016, Appellant timely filed his first and current *pro se* PCRA petition. Appellant subsequently retained PCRA counsel. Appellant filed an amended PCRA petition on May 4, 2017, and a supplemental PCRA petition on July 25, 2017, in which Appellant raised claims of ineffective assistance of trial and appellate counsel. On August 7, 2017, the PCRA court issued Rule 907 notice. On August 17, 2017, Appellant filed a "Motion to Continue," requesting the court to allow Appellant additional time to obtain an affidavit from Mr. Carbone regarding his trial testimony. The court denied Appellant's motion on August 18, 2017. The court, however, allowed Appellant to present an after-discovered evidence claim in his response to

the Rule 907 notice and extended the time for filing a Rule 907 notice response. On September 11, 2017, Appellant filed a response to Rule 907 notice. In the September 11th filing, Appellant alleged Mr. Carbone recanted his trial testimony that he had been threatened or coerced to retract his grand jury testimony. Appellant appended to his September 11th filing an affidavit of Mr. Carbone. On September 13, 2017, the PCRA court dismissed Appellant's PCRA petition.

On September 29, 2017, Appellant timely filed a *pro se* notice of appeal and request for counsel. The PCRA court appointed new counsel on October 30, 2017. The PCRA court ordered Appellant on November 2, 2017, to file a concise statement of errors complained of on appeal per Pa.R.A.P. 1925(b); Appellant failed to comply. Nevertheless, the PCRA court issued a Rule 1925(a) opinion on December 1, 2017. On December 8, 2017, counsel sent a letter to the PCRA court explaining he did not file a Rule 1925(b) statement on behalf of Appellant, because counsel believed he had a potential conflict of interest in representing Appellant. Despite his perceived conflict of interest, counsel filed in this Court a brief on behalf of Appellant.

We returned this matter briefly to the PCRA court with instructions for the court to appoint new counsel for Appellant and order counsel to file a Rule 1925(b) statement. We gave the PCRA court 30 days after receipt of Appellant's compliant Rule 1925(b) statement to prepare a responsive opinion, pursuant to Rule 1925(a), and transmit the certified record to this

Court along with all new documents certified as part of that record. We have received the necessary documents as part of the certified record and now proceed with the appeal.

Appellant raises the following issues for our review:

> WHETHER TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO THE PROSECUTION'S USE OF UNSUBSTANTIATED CLAIMS OF WITNESS INTIMIDATION BY APPELLANT[?]
>
> WHETHER TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO OR PLACE ON THE RECORD THAT THE COMMONWEALTH USED ITS PEREMPTORY JURY STRIKES IN A RACIALLY DISCRIMINATORY MANNER[?]
>
> WHETHER APPELLANT'S [DIRECT APPEAL] COUNSEL WAS INEFFECTIVE FOR FAILING TO PROPERLY SPECIFY WHAT ELEMENTS OF THE OFFENSE HAD NOT BEEN MET IN THE [RULE] 1925(B) STATEMENT OF ERRORS[?]
>
> WHETHER APPELLANT IS ENTITLED TO A NEW TRIAL BASED UPON DUE PROCESS VIOLATIONS WHEN AFTER DISCOVERED EXCULPATORY EVIDENCE WHICH WAS UNAVAILABLE AT THE TIME OF TRIAL[?]

(Appellant's Brief at 4).[2]

Our standard of review of the denial of a PCRA petition is limited to examining whether the evidence of record supports the court's determination and whether its decision is free of legal error. *Commonwealth v. Conway*, 14 A.3d 101, 108 (Pa.Super. 2011), *appeal denied*, 612 Pa. 687, 29 A.3d 795 (2011). This Court grants great deference

---

[2] Appellant also claims the PCRA court should have conducted an evidentiary hearing before it dismissed his PCRA petition. (**See** Rule 1925(b) Statement, filed December 20, 2018).

to the findings of the PCRA court if the record contains any support for those findings. *Commonwealth v. Boyd*, 923 A.2d 513, 515 (Pa.Super. 2007), *appeal denied*, 593 Pa. 754, 932 A.2d 74 (2007). We give no such deference, however, to the court's legal conclusions. *Commonwealth v. Ford*, 44 A.3d 1190, 1194 (Pa.Super. 2012). The PCRA court findings will not be disturbed if the certified record supports the court's findings. *Commonwealth v. Taylor*, 933 A.2d 1035, 1040 (Pa.Super. 2007), *appeal denied*, 597 Pa. 715, 951 A.2d 1163 (2008). Further, a petitioner is not entitled to a PCRA hearing as a matter of right; the PCRA court can decline to hold a hearing if there is no genuine issue concerning any material fact, the petitioner is not entitled to PCRA relief, and no purpose would be served by any further proceedings. *Commonwealth v. Wah*, 42 A.3d 335, 338 (Pa.Super. 2012); Pa.R.Crim.P. 907.

After a thorough review of the record, the briefs of the parties, applicable law, and the well-reasoned opinion of the Honorable Wendy Demchick Alloy, we conclude Appellant's issues merit no relief. The PCRA court opinion discusses and properly disposes of the questions presented. (*See* PCRA Court Opinion, filed January 8, 2019, at 7-35) (finding: **(3)** trial evidence was sufficient to allow jury to convict Appellant of first-degree murder, conspiracy to commit murder, and solicitation to commit murder; underlying claim that evidence was not sufficient to convict Appellant lacked arguable merit; therefore, Appellant's claim direct appeal counsel rendered

ineffective assistance fails; **(1)** at trial, Commonwealth did not accuse Appellant of witness intimidation; Mr. Carbone repeatedly blurted out that he feared for his life and lives of his family, but his statements were not responsive to any questions Commonwealth posed; exchange between Commonwealth and Mr. Carbone made clear Commonwealth did not intend to or expect Mr. Carbone to testify as he did; Commonwealth noted Mr. Carbone's demeanor became erratic when Appellant's brother entered courtroom; Mr. Carbone at no time stated, however, that Appellant or anyone associated with Appellant threatened him or threatened to harm his family; no reasonable pretrial investigation could have enabled trial counsel to anticipate Mr. Carbone's sudden outbursts; further, trial counsel elicited from Mr. Carbone on cross-examination that Mr. Carbone did not believe Appellant paid Bruce Woods to kill anyone, which supported Appellant's defense; **(4)** statements in Mr. Carbone's affidavit are consistent with his trial testimony; moreover, even if Mr. Carbone had recanted his trial testimony, his testimony cannot be expunged from record and would remain relevant and admissible to test Mr. Carbone's veracity at new trial; new trial would not rectify alleged harm Mr. Carbone's testimony caused at first trial; facts before jury at new trial would not be materially different from facts adduced at first trial, and new trial jury would likely also learn Mr. Carbone had changed his testimony because he feared retaliation; further, exchange between prosecutor and Mr. Carbone at first trial did not prejudice Appellant

in comparison to likely exchange between Commonwealth and Mr. Carbone at retrial; **(2)** in his PCRA petition, Appellant failed to plead sufficient facts or point to any direct evidence to prove purposeful discrimination on behalf of Commonwealth in selecting jury; therefore, Appellant's discriminatory jury selection claim fails; based on foregoing, evidentiary hearing was unnecessary, because Appellant's PCRA petition raised no genuine issues of material fact and hearing would have served no purpose).  The record supports the PCRA court's rationale.  Accordingly, we affirm on the basis of the PCRA court opinion.

Order affirmed.

Judge Platt did not participate in the consideration or decision of this case.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/26/19

IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA

CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA     :     No. CP-46-CR-0007840-2012

        v.                  :

TYUAN SIMON                       :

## **O P I N I O N**

DEMCHICK ALLOY, J.                               JANUARY 8, 2019

Petitioner, Tyuan Simon, has appealed from the order filed September 13, 2017, denying his counseled applications for post-conviction collateral relief. This opinion is filed in compliance with the memorandum and order filed by the Superior Court of Pennsylvania on October 3, 2018 and supersedes the opinions filed by the undersigned judge on December 1, 2017 and December 13, 2017.

## I.     **Facts and History of the Case**

On August 2, 2012, petitioner was arrested, arraigned and charged with murder and other offenses related to the killing of Tyree Whiting in Norristown, Pennsylvania on October 19, 2010. Petitioner was tried before a jury from June 24-27, 2013, and was found guilty of murder in the first degree, criminal solicitation of Bruce Woods to commit murder in the first degree, and criminal conspiracy with Woods to commit murder in the first degree. Petitioner filed a direct appeal from the judgement of sentence. On direct appeal, he raised three claims: the evidence was not sufficient for the jury to find appellant guilty of the charges; the jury's verdict was against the weight of the evidence

as to all three charges; and the undersigned judge erred by admitting evidence that petitioner had choked, beaten and threatened to kill a woman in an incident for which he was not on trial in the above-captioned matter. The Superior Court of Pennsylvania affirmed the judgment of sentence, but in doing so, decided that appellate counsel had waived the first claim by failing to specify the elements of the offenses not supported by sufficient evidence. See Superior Court Opinion, pp. 7-9.

On May 3, 2016, petitioner filed, *pro se*, his first petition for post-conviction collateral relief pursuant to the Post-Conviction Relief Act (hereinafter, "PCRA"), 42 Pa.C.S. §§ 9541-9547. The undersigned judge appointed counsel to represent petitioner. In an order filed October 14, 2016, the undersigned judge determined that the *pro se* petition failed to plead facts establishing a *prima facie* claim for relief and directed court-appointed counsel to either file an amended petition or a petition to withdraw as counsel within twenty days. On the same day, October 14, 2016, R. Davis Younts, Esquire, entered his appearance on behalf of petitioner. After Mr. Younts was granted several extensions of time, he filed an amended PCRA petition on May 4, 2017 (hereinafter "the May 4th petition").

The undersigned ordered the District Attorney to file an answer to the May 4th petition, which raised three claims. After considering the May 4th petition and answer, the undersigned filed an order on July 17, 2017, pursuant to Pa.R.Crim.P. 905(B), notifying petitioner that the second and third

2

claims of the May 4th petition were defective. The order indicated the nature of the defects and granted petitioner leave to file a second amended petition within twenty days. Petitioner, through counsel, responded on July 25, 2017 by filing a second amended petition, styled as a "Supplemental Petition for Relief Pursuant to the Post-Conviction Relief Act" (hereinafter "the July 25th petition").

On August 7, 2017, pursuant to Pa.R.Crim.P. 907(1), the undersigned filed an order that independently reviewed the July 25th petition and the May 4th petition together as an integrated application for post-conviction collateral relief. The undersigned concluded that petitioner was not entitled to any relief under the Post-Conviction Relief Act, and that no purpose would be served by any further proceedings. The order of August 7th advised petitioner that the undersigned proposed to deny PCRA relief without a hearing, and further advised him of his right to file a response with the Clerk of Courts within twenty days, after which the undersigned would, in conformity with Rule 907(1), "order the petition dismissed, **grant leave** to file an amended petition, or **direct that the proceedings continue.**" See order filed August 7, 2017, p. 22 (bold emphasis added).

As required by Rule 907(1), the order of August 7th stated the reasons the petition should be denied. On August 17th, attorney Younts filed a request for an extension of the period for filing a response "in order for...counsel to obtain a signed affidavit from witness Christopher Carbone that recants a

3

portion of his trial testimony." As will be explained in more detail *infra*, the Commonwealth called Mr. Carbone as a trial witness, but he quickly refused to testify, stating under oath and on the record that he feared for his life and the lives of his parents, who live in Norristown. In order to minimize the incentive for anyone to intimidate (or further intimidate) Mr. Carbone, a prison inmate, the undersigned filed an order that granted Mr. Younts's request for a continuance, but only in part. For reasons discussed in the margin, *infra* section III.B.4, the undersigned granted attorney Younts leave to:

> (a) ask the undersigned to **assume**, *arguendo*, **that petitioner is ready, willing and able to file an affidavit by Christopher Carbone** recanting a portion of his trial testimony; (b) specify the portions Mr. Carbone **would** recant, with citations to the pages of the transcribed notes his trial testimony; and (c) prove **by argumentation** that **if such an affidavit is filed** on the record, then an issue of material fact exists as to whether petitioner is entitled to post-conviction collateral relief.

See order filed August 18, 2017 (bold emphasis added). By channeling Mr. Younts's response in that manner, the undersigned preserved petitioner's ability to obtain PCRA relief while minimizing the incentive for intimidation of Mr. Carbone. Mr. Younts responded by filing a third amended PCRA petition, styled as a "Supplemental Petition for Relief Pursuant to the Post-Conviction Relief Act," on September 11, 2017 (hereinafter, "the September 11th petition).

By order filed September 13, 2017, the undersigned denied post-conviction collateral relief. As was expressly stated in the order, the undersigned considered the September 11th petition before deciding to deny post-conviction collateral relief. The original opinion on appeal from denial of

4

PCRA relief also addressed the facts and legal argument of the September 11th petition. This opinion does so as well, in section III.B., *infra.*

On September 29, 2017, petitioner, acting *pro se,* filed a notice of appeal and an application for appointment of counsel on appeal. By order of October 20, 2017, the undersigned retroactively granted petitioner leave to proceed *pro se* while represented by attorney Younts for the limited purpose of filing his notice of appeal, application to proceed on appeal in forma pauperis and application for appointment of new counsel on appeal. The undersigned judge appointed Kent T. Lloyd, Esquire, to represent petitioner on appeal, but after attorney Lloyd notified the undersigned that he would be unable to serve as appellate counsel, the undersigned appointed John F. Walko, Esquire, to represent petitioner. Mr. Walko notified the undersigned that he perceived a conflict of interest only after the undersigned filed an opinion pursuant to Pa.R.A.P. 1925(a). The undersigned then filed a supplemental opinion requesting that the Superior Court remand the matter for appointment of new appellate counsel. By memorandum and order filed October 3, 2018, the Superior Court remanded the matter with instructions to appoint new counsel, direct counsel to file a statement of errors complained of on appeal, and file a supplemental opinion in response to the statement of errors.

The undersigned initially appointed Gregory P. DiPippo, Esquire, to represent petitioner, but after Mr. DiPippo notified the undersigned that he perceived a conflict of interest with a former client, the undersigned appointed

5

Patrick J. McMenamin, Esquire, to represent petitioner. The undersigned gave Mr. McMenamin sixty days to review the record before filing a statement of errors. Mr. McMenamin filed the statement on December 20, 2018. The instant opinion responds to that statement.

## II. Claims of Error Alleged by petitioner on Appeal

The statement filed by Mr. McMenamin on behalf of petitioner raises five claims of error. Petitioner first alleges that the undersigned "erred in denying [petitioner] an evidentiary hearing under the Post-Conviction Relief Act[.]" This opinion will address that claim last, because the reasons for denying an evidentiary hearing will become apparent after the discussion of the other claims.

Second, petitioner alleges that the undersigned erred in determining that trial counsel rendered effective assistance despite his "failure to object the prosecution's use of unsubstantiated claims of witness intimidation by [petitioner] toward witness Christopher Carbone[.]" petitioner had raised that claim in his May 4th petition, which alleged trial counsel "failed to object to the prosecution's use of unsubstantiated claims of witness intimidation by the petitioner in an effort to secure a guilty verdict based solely upon the passions of the jury." May 4th petition, p. 3.

Third, petitioner alleges on appeal that the undersigned erred by determining that trial counsel provided effective assistance notwithstanding his "failure to object to...the Commonwealth using peremptory jury strikes in a

6

racially discriminatory manner[.]" Petitioner had raised that claim in his May 4th petition, which alleged that trial and appellate counsel "failed to object to, or place on the record at trial, the issue that petitioner was tried and convicted by a jury tainted by racial exclusion." May 4th Petition, p. 10.

Fourth, petitioner alleges on appeal that the undersigned erred by determining that defense counsel on direct appeal provided effective assistance despite his "failure to properly specify what elements of the offense had not been proven in counsel's 1925(b) direct appeal statement[.]" Petitioner made the same allegation in the May 4th petition, which alleged that appellate counsel "failed to properly specify what elements of the offenses had not been met...." May 4th petition, p. 13. This opinion will discuss this claim of error first, because it provides an opportunity to orient the reader to facts of the murder, which provide context for the claims regarding Mr. Carbone.

Finally, petitioner alleges on appeal that the undersigned erred by denying his claim that he is entitled to a new trial "on the basis of after-discovered evidence that was unavailable at the time of trial." The undersigned perceives this claim to pertain to the testimony of Christopher Carbone, and will address it in conjunction with the second claim of error on appeal.

### III. Discussion

All of petitioner's substantive claims, addressed in sections III.A. through III.C., allege ineffective assistance of counsel. Claims of ineffective assistance of counsel are not "self proving," hence a boilerplate claim of ineffectiveness is

7

insufficient to warrant relief. *Commonwealth v. Spotz*, 896 A.2d 1191, 1250 (Pa. 2006). It is a "fundamental proposition that the PCRA requires a petitioner to *plead and prove* his claim...." *Commonwealth v. Williams*, 782 A.2d 517, 526 (Pa. 2001) (emphasis in original).

> The Pennsylvania test for ineffectiveness is, in substance, the same as the two-part performance-and-prejudice standard set forth by the United States Supreme Court...although this Court has divided the performance element into two sub-parts dealing with arguable merit and reasonable strategy. Thus, to succeed on an ineffectiveness claim, a petitioner must establish that: the underlying legal claim has arguable merit; counsel had no reasonable basis for her action or inaction; and the petitioner suffered prejudice as a result.

*Commonwealth v. King*, 57 A.3d 607, 613 (Pa. 2012) (citations omitted).

**A.    Petitioner was not entitled to post-conviction collateral relief notwithstanding that his lawyer on direct appeal failed to specify which elements of the offenses the Commonwealth failed to support with sufficient evidence**

Petitioner alleged prior counsel failed to preserve for direct appellate review a claim that the verdict was not supported by sufficient evidence. See May 4th petition, ¶¶ 40, 43. Petitioner raised the claim on direct appeal, but the Superior Court concluded that he had waived it because petitioner's lawyer failed to specify which elements of which offenses the Commonwealth allegedly failed to prove. See Superior Court Opinion filed December 12, 2014, pp. 8-9. The May 4th PCRA petition shared the same defect, but the July 25th petition corrected it. See July 25th petition, ¶ 15. Specifically, petitioner contended that the trial evidence was insufficient to prove that petitioner intended to kill Whiting. *Id.* Petitioner then argued that without evidence of specific intent to

8

kill, the evidence was insufficient to prove the crime of murder in the first degree; and therefore the evidence is insufficient to prove solicitation to commit murder and criminal conspiracy to commit murder. The evidence of record shows otherwise.

Bruce Woods intentionally shot Tyree Whiting to death. Those facts are not in dispute, and they are sufficient to prove Woods committed the crime of murder in the first degree. See 42 Pa.C.S. § 2502(a) (defining murder in the first degree as an intentional homicide). Petitioner claimed the trial evidence was insufficient to hold him legally responsible for the murder by solicitation and conspiracy. The evidence against petitioner may be divided into three categories: (1) events probative of petitioner's motive to kill Whiting; (2) a brief conversation at a tavern on the night of the murder, in which petitioner used slang to offer $10,000.00 to Woods to kill Whiting, and Woods accepted the offer; and (3) events after the murder from which the jury could infer that petitioner had intended for Woods to kill Whiting and was conscious of his own guilt.

### 1. Petitioner's motive to kill Whiting

Whiting had an intimate relationship for years with a young lady named Veronica Graham. N.T. June 25, 2013, pp. 239-40. In 2010, she ended the relationship and began an intimate relationship with petitioner. *Id.* at 240. Whiting was heartbroken because he remained "madly in love with her." N.T. June 26, 2013, p. 98. Whiting then began to gossip about petitioner. He told

9

Taria Mayo-Giddings, another woman with whom petitioner had a long-term intimate relationship (both before and during his affair with Ms. Graham), that petitioner had paid Ms. Graham's rent shortly after petitioner told Ms. Mayo-Giddings he did not have money to contribute to hers. *Id.* at 94. Whiting also seeded rumors that petitioner had willingly engaged in gay sex while serving a prison sentence, and that he was possibly infected with AIDS. *Id.* at 105, 106, 251-52; N.T. June 24, 2013, pp. 63-67; N.T. June 25, 2013, pp. 265-66. A witness testified that among the people with whom petitioner and Whiting associated, the accusation that a man is homosexual is one of the worst insults one can give. N.T. June 26, 2013, p. 252-53.

Petitioner was furious that Whiting was gossiping and spreading rumors about him. Five days before the murder, when Ms. Mayo-Giddings confronted petitioner about paying rent for Graham but not her, he exclaimed, "I'm tired of this punk-ass n----- with my name in his mouth, and I'm going to handle this tonight." N.T. June 26, 2013, pp. 94-95. He then slammed his bottle of beer on the table and stormed out to the Roo House Tavern. *Id.* at 95-96. Shortly afterward he returned to the neighborhood and, upon seeing Ms. Mayo-Giddings, told her, "if somebody dies tonight, it's going to be on your conscience and your hands." *Id.* at 96. Petitioner did not, however, carry out his threat that night. When Ms. Graham heard a rumor that petitioner said he was going to kill Whiting, she asked petitioner about it. N.T. June 25, 2013, p. 265. Petitioner admitted being angry with Whiting and saying he was going to

kill him, but he told Ms. Graham "he didn't mean it." *Id.* at 265-66.

So incensed was petitioner about the rumors of his homosexuality that his ire did not subside even after Whiting died. Two or three days later Ms. Mayo-Giddings "told him he's living a lie," said that "if you can't be real with nobody else, you got to at least be real with yourself," and asked him to go with her to be tested for AIDS. N.T. June 26, 2013, pp. 106-07. He became so angry that he grabbed her by the neck, choked her, slammed her into the wall of their apartment, and said, "I could kill you today, and nobody would even know." *Id.* at 107-08.

### 2. The conversation at the Roo House Tavern on the night of the murder

On the night of the murder, petitioner and Whiting went separately to the Roo House Tavern. N.T. June 24, 2013, p. 60; N.T. June 25, 2013, pp. 165-66, 176, 185-86. When Whiting arrived, he spoke to a man named Von Mims. N.T. June 24, 2013, pp. 62-63. Whiting knew that Mims and petitioner had been incarcerated in the same prison at the same time, so he asked Mims whether petitioner had willingly engaged in gay sex as a prisoner. *Id.* at 63-66. As Whiting spoke to him, Mims saw petitioner staring at them. *Id.* at 69. Minutes later, petitioner approached Mims when he was alone and asked, "was that n----- talking about me[?]" *Id.* at 67, 70.

Bruce Woods met petitioner, Jason Jones and Janile Clark at the Roo House Tavern that night. N.T. June 25, 2013, p. 176; N.T. June 26, 2013, pp. 9-11. Woods was sitting opposite petitioner when he saw petitioner's facial

11

expression change suddenly from normal to angry and aggressive. N.T. June 26, 2013, pp. 12-13. When Woods asked petitioner "what's up[?]" he replied, "this rat-ass n-----." *Id.* at 14. Woods turned around to see who petitioner was talking about, and saw Whiting. *Id.* at 14, 35.

Woods explained that a "rat" is a person who informs the police about the illegal activities of others. *Id.* at 15. Woods stated that according to "the code of the streets, he ain't 'posed to be around here walking around." *Id.* at 35. "They're a rat, they don't deserve to live," he said. *Id.* at 17. "The rat got to die." *Id.* at 35.

Petitioner then left the group briefly to check his cell phone, and when he returned he declared that "he had a dime on main [sic] man head," referring to Whiting. *Id.* at 15-16. Woods explained that "a dime" meant ten thousand dollars. *Id.* at 16. Woods continued, "I was like, 'yeah?' He was like, 'yeah.' That's when I said, 'say no more.'" *Id.* Shortly after that, Woods went outside, then followed Whiting when he left the tavern and shot him to death only a few blocks away. *Id.* at 19-23.

On cross-examination, trial counsel for petitioner elicited testimony from Woods that the prosecutors had agreed not to seek the death penalty in exchange for his promise to testify against petitioner. Although that fact is not salient to the sufficiency of the evidence, it is relevant to the discussion in section III.B., *infra*, regarding the prosecutors' attempt to bolster Woods's credibility by calling Christopher Carbone to testify about a prior consistent

12

statement Woods made to him in prison after the murder.

### 3. Events after the murder

Petitioner left the tavern after Whiting and went to Veronica Graham's house. When he arrived, he asked if she loved him, and if she would "do anything for him." N.T. June 25, 2013, p. 248. Shortly after he arrived he had a telephone conversation, during which he disguised his voice by simulating a Jamaican accent. Id. at pp. 247-48. Petitioner told the other party that "he had to get out of there. It was too hot in there." Id. at 248. Then he asked, "did he check out[?]" Id. The other party to the telephone conversation was Bruce Woods, who told petitioner there had just been a shooting in Norristown, thereby implying that he had murdered Whiting. N.T. June 26, 2013, pp. 31-32; see also N.T. June 27, 2013, pp. 47-48 and Commonwealth's trial exhibit 30 (photograph of Woods's cell phone, showing one-minute call placed to petitioner at 11:30 p.m. on the night of the murder). Woods testified that he refrained from saying anything that would show he knew who had been killed, because he could not know whether anyone else was within earshot of petitioner's cell phone. Id. at 34. The jury could infer that petitioner disguised his voice because he could not know whether anyone else was in earshot of Woods's phone.

Shortly after that, two law enforcement officers arrived at Ms. Graham's apartment, which was only blocks from the murder scene, to tell her that Whiting had been murdered and to ask whether she had contact information

13

for his next of kin. N.T. June 25, 2013, pp. 11-12, 249-51. Ms. Graham began to cry, *id.* at 250, but petitioner showed no emotional reaction to the news, *id.* at 12. Ms. Graham and petitioner then walked to the scene of the murder, where petitioner made a spectacle of himself, jabbing his finger toward the ground and exclaiming, "that's what the f--- he gets." *Id.* at 41.

At approximately the same time, a woman named Tovah Perry met Ms. Graham and petitioner at a location that was within view of the murder scene. *Id.* at 62-65. Ms. Perry asked petitioner to leave the area with her. N.T. June 25, 2013, pp. 253. Petitioner replied, referring to Ms. Graham, "she's my alibi." *Id.* The next day, petitioner told Ms. Mayo-Giddings that he "had an alibi," Veronica Graham. N.T. June 26, 2013, p. 101.

He also told Ms. Mayo-Giddings that Woods murdered Whiting. *Id.* at 103. In contrast, he told Ms. Graham that he didn't know Bruce Woods. N.T. June 25, 2013, p. 256. The difference between what he told the two women is circumstantial evidence that petitioner was trying to conceal his involvement in the murder. He knew he could not tell Ms. Mayo-Giddings that he did not know Woods, because he introduced Woods to her, and brought Woods to her home on several occasions. N.T. June 26, 2013, pp. 89-92. Therefore, rather than telling Ms. Mayo-Giddings the same story he told Ms. Graham, he told her instead that Woods had killed Whiting.

In the ensuing months, Ms. Graham asked petitioner "all the time" about the murder, N.T. June 25, 2013, p. 255, and gradually the story he told her

14

began to unravel. When she asked him whether he had spoken to Woods at the Roo House Tavern on the night of the murder, he replied that he didn't know Woods, but when she said someone told her he had, petitioner changed his story and told her that Woods had come to his table and asked for money or beer. *Id.* He then told Ms. Graham that he left the tavern after Woods, and when he got outside, he saw Woods tying a scarf around his face. *Id.* at 256. He told her that when he asked Woods why, Woods said he was preparing for a robbery. *Id.* at 256-57.

In support of his claim that he didn't know Woods, petitioner told Ms. Graham that Woods's telephone number was not in the call log of his cell phone. *Id.* at 257. When Ms. Graham learned that petitioner's cell phone log showed a call from Woods after the murder, petitioner claimed he didn't remember because "so many people called me" and said, "I might have talked to him for a couple of minutes...." *Id.* at 258. Ms. Graham confronted him with his earlier claim that he didn't know Woods, and asked how Woods could have known his telephone number if that was so. *Id.* Petitioner then admitted that he knew Woods. *Id.* He then said that he was not going to jail for the murder, or if he did, he would not serve much time, because he "didn't pull the trigger...." *Id.* at 264.

Several weeks after the murder, petitioner confronted Janile Clark, who had shared a table at the Roo House with Jason Jones, petitioner and Woods on the night of the murder. N.T. June 26, 2013, pp. 215-221. Petitioner was

15

angry because he heard a rumor that Clark had testified about him to a grand jury that was investigating the murder. *Id.* at 221. Petitioner said, "I ain't taking this by myself," and "I ain't going out like that by myself, 'cause there was another party involved, too." *Id.* at 222.

The jury also heard testimony from Jerome Kemp, who said petitioner "was my man," and elaborated that he would do "whatever was necessary to protect him," including, "[i]f need be, kill somebody...." *Id.* at 249. It was, therefore, no coincidence that petitioner confided in Kemp about the murder: "he pretty much laid everything out." *Id.* at 246. He told Kemp that Whiting had been spreading rumors that he was gay. *Id.* at 251-52. He said that the murder had gone "as planned," except for two things: someone who knew Woods had seen him following Whiting on the street and telephoned Woods immediately before the murder,[1] and Woods called petitioner immediately after the murder to demand payment. N.T. June 26, 2013, p. 250.

Petitioner told Kemp that he had only paid Woods $2,000.00 of the $10,000.00 he had promised, and Woods had been telephoning him from the jail to demand the rest of the money. *Id.* at 248. While Kemp was speaking to petitioner, Woods called petitioner's cell phone. *Id.* Kemp testified that petitioner was concerned that Woods wasn't going to be able to resist

---

[1] Woods, James Williams and Brandon Thompson testified that Thompson called Woods on his cell phone immediately before the murder as Woods was following Whiting. Williams recognized Whiting and Woods, and when he told Thompson that Woods had just walked by, Thompson called Woods to see whether Williams had been correct. See N.T. June 26, 2013, pp. 20-23 (testimony of Woods); June 25, 2013, pp. 212-16 (testimony of Williams); *id.* at 221-27 (testimony of Thompson).

interrogation by the police. *Id.* at 247. Petitioner also told him he was concerned that Ms. Graham was not going to be able to resist interrogation, and that she would not provide him an alibi as he had hoped. *Id.* at 254-55.

### 4. The foregoing evidence is sufficient to support the jury's verdicts

"A person is guilty of solicitation to commit a crime if with the intent of promoting or facilitating its commission he commands, encourages or requests another person to engage in specific conduct which would constitute such crime...or which would establish his complicity in its commission...." 18 Pa.C.S. § 902(a). "A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he...agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime...." 18 Pa.C.S. § 903(a).

Petitioner argued in his post-trial motion that he did nothing more than tell Woods how upset he was with Whiting, and that he could not have predicted Woods would react by shooting Whiting to death. The jury, however, heard Jerome Kemp testify that petitioner told him the murder went according to his plan. Petitioner also argued that the only evidence proving solicitation was the uncorroborated testimony of Woods, a biased witness. Woods was interested in obtaining leniency in exchange for his testimony, but his testimony was not so unreliable as to render the jury's verdict "a matter of pure conjecture." *Commonwealth v. Todt*, 464 A.2d 1226, 1229-30 (Pa. 1983).

17

Kemp's testimony corroborated Woods's testimony. Moreover, the Commonwealth produced much additional evidence supporting the verdict. For example, petitioner reacted enthusiastically at the murder scene, pointing and exclaiming "that's what the f--- he gets." Also, his actions after the murder showed consciousness of guilt. He disguised his voice when Woods telephoned after the murder and asked, "did he check out?" He referred to Ms. Graham as "my alibi." He falsely told Ms. Graham that he did not know Woods. He confronted Janile Clark about his testimony to the grand jury.

The jury was permitted to receive this evidence and infer that petitioner was involved in Whiting's murder by way of solicitation and conspiracy because "it is difficult to prove an explicit or formal agreement; hence, the agreement is generally established via circumstantial evidence, such as by 'the relations, conduct, or circumstances of the parties or overt acts on the part of co-conspirators.'" *Commonwealth v. Sanchez*, 82 A.3d 943, 973 (Pa. 2013) (quoting *Commonwealth v. Johnson*, 985 A.2d 915, 920 (Pa. 2009)). "[E]ach member of a conspiracy to commit homicide can be convicted of first-degree murder regardless of who inflicted the fatal wound." *Commonwealth v. Montalvo*, 956 A.2d 926, 932 (Pa. 2008). Therefore the circumstantial evidence produced at trial was sufficient to support the guilty verdicts against petitioner.

### 5. The underlying claim against counsel on direct appeal lacked merit

Petitioner's appellate lawyer cannot be deemed ineffective for having failed to raise a meritless claim on direct appeal. *See Commonwealth v. Jones*,

18

590 Pa. 202, 219, 912 A.2d 268, 278 (2006) ("Counsel will not be deemed ineffective for failing to raise a meritless claim."). The foregoing discussion shows that there was no merit to the claim that the evidence was insufficient to support the guilty verdicts. Therefore, appellate counsel could not be deemed ineffective.

**B.  Petitioner's claim that a prosecutor made an unsubstantiated claim of witness intimidation by petitioner against Christopher Carbone lacks factual support, as does the claim that trial counsel rendered ineffective assistance by failing to object to Carbone's testimony**

This claim of error and the underlying PCRA claim are defective for several reasons. First, petitioner faulted his trial lawyer for having failed to object to an accusation that was never made. Second, trial counsel had a reasonable strategic basis for refraining from objecting to the testimony that was actually given. Third, the alleged after-discovered evidence does not support the award of a new trial even if one assumes, *arguendo*, that it is true. In order to evaluate the facts relevant to this claim, discussed *infra*, readers must bear in mind that Christopher Carbone had no personal knowledge of anything petitioner said or did in regard to the murder of Tyree Whiting. The prosecutors called Mr. Carbone only to testify about a prior consistent statement that Bruce Woods made to Carbone in prison, in order to rehabilitate Woods's credibility after his cross examination. That plan went awry. On the witness stand, Mr. Carbone repeatedly blurted out that he feared for his life and the lives of his family. Those statements were not responsive to any questions the prosecutor asked and moreover, Mr. Carbone never stated that

19

petitioner or anyone associated with him threatened him or threatened to harm his family.

## 1. Petitioner's claim was unsupported by the trial record

Petitioner's first claim was pled in paragraphs 8-24 of the May 4th petition. The only averments of fact in support of the first claim were in paragraphs 16, 19 and 20.[2] In paragraph 16, petitioner averred that one of the prosecuting attorneys, former Assistant District Attorney Matthew Quigg, asked one of the witnesses for the prosecution, Christopher Carbone, "whether Carbone became fearful during testimony after the petitioner's brother entered the court room." Likewise, in paragraph 19, petitioner averred that A.D.A. Quigg "inquired as to whether Carbone became afraid when petitioner's brother entered the courtroom...." Those facts are correct, but by presenting them out of context, attorney Younts mischaracterized their significance. Worse still, attorney Younts averred, in paragraph 20, that A.D.A. Quigg "went so far as to accuse the petitioner's brother of threatening Carbone, a claim refuted by Carbone." That averment is completely unsupported by the facts of record.

At the beginning of his trial testimony, Carbone gave cogent, responsive answers when asked whether he had met Woods while the two were incarcerated at the Montgomery County Correctional Facility and whether Woods said he murdered Whiting. N.T. June 26, 2013, pp. 154-58. When

---

[2] Paragraphs 8-15, 17 and 18 recite law in anticipation of application to the facts, but these paragraphs aver no facts themselves. Paragraphs 21-24 make legal argumentation based on the facts averred in paragraphs 16, 19 and 20 but aver no additional facts.

20

A.D.A. Quigg asked whether Woods had said a man named "Slim" paid him to murder Whiting, Carbone unexpectedly replied, "I do not want to answer that question in fear of intimidation of my family." *Id.* at 158-59. It quickly became clear to all in the courtroom that A.D.A. Quigg did not intend to elicit that response, did not expect it, and was unable to salvage Carbone as a trial witness.

A.D.A. Quigg worked skillfully but unsuccessfully to coax Carbone to testify consistently with his grand jury testimony, but Carbone reacted by stating that he was "on medication now for paranoid schizophrenia," *id.* at 161, and making other unsolicited, sometimes contradictory, statements intended to undermine the credibility of his grand jury testimony. See *id.* at 159-73.[3] He also blurted out several more times that he feared that his family might be killed if he testified. *Id.* at 159, 161, 164, 165, 173, 176. After the seventh time he spontaneously expressed that fear, A.D.A. Quigg told him that he observed Carbone's demeanor change when petitioner's brother, Sidel Simon, entered the courtroom. *Id.* at 176-77. The undersigned, who presided over the trial, also observed the change. Carbone's reaction was so erratic that A.D.A.

---

[3] Carbone implied that his grand jury testimony had been untruthful because he "was under duress," "was promised freedom," and was "chained to a bench for hours at a time, fed nothing." *Id.* at 160; *see also id.* at 162, 163, 165, 173, 178. He simultaneously maintained that he did not remember his grand jury testimony because of the effects of psychiatric medication. *Id.* at 161, 162, 163, 165, 168, 169, 170. He implied that his grand jury testimony was unreliable because he did not know petitioner. *Id.* at 160-61, 164. He also stated that his own defense attorney had "coerced" him to incriminate petitioner when testifying before the grand jury in return for a short sentence on pending felony charges. *Id.* at 163-64, 165, 166, 168, 169, 170-71, 172-73.

21

Quigg altogether gave up attempting to get Carbone to testify. *See id.* at 177-79 (including, *inter alia,* Carbone raving that he saw his lawyer "on camera, smoking crack"). A.D.A. Quigg ended his direct examination without accusing petitioner's brother, let alone petitioner, of actually intimidating Carbone.

### 2. Trial counsel had a reasonable basis for not objecting during the direct examination of Carbone, and petitioner was not prejudiced by counsel's failure to object

Petitioner's claim required proof that his trial lawyer lacked a reasonable strategy for refraining from objecting during the direct examination of Carbone. The inquiry into reasonable strategy is not whether other alternatives were more reasonable. *Commonwealth v. Good,* 393 A.2d 30, 32 (Pa. 1978). Rather, "the balance tips in favor of a finding of effective assistance as soon as it is determined that trial counsel's decision had any reasonable basis." *Id.* (quoting *Commonwealth ex rel. Washington v. Maroney,* 235 A.2d 349, 352 (Pa. 1967)).

Petitioner argued, in paragraph 23 of the May 4th petition, that his trial lawyer "should have conducted a reasonable pre-trial investigation, anticipated this situation as a potential issue, and been prepared to object and counter it." No reasonable pretrial investigation could have enabled petitioner's trial lawyer to anticipate Mr. Carbone's sudden, paranoid spontaneous utterances or the change in his demeanor when Sidel Simon entered the courtroom. Even A.D.A. Quigg, with whom the undersigned was well acquainted as a very capable prosecutor, apparently failed to anticipate it, notwithstanding that he undoubtedly had spent time preparing Mr. Carbone to testify.

22

Moreover, trial counsel's reaction could not be improved upon. An objection would have been meritless and counterproductive. The prosecutor was permitted to ask his witness, on direct examination, whether fear of retribution motivated or induced him to testify differently at trial as compared to at the grand jury investigation. *See Commonwealth v. Baston*, 363 A.2d 1178, 1185 (Pa. Super. Ct. 1976) (*en banc*) ("It is 'hornbook' law that a witness's motivation or inducement to testify is properly within the scope of cross-examination"). If trial counsel had objected to A.D.A. Quigg's remark about petitioner's brother, it would have drawn an explanation from the prosecutor, thus encouraging the jurors to dwell on the possibility of witness intimidation. Therefore, petitioner's trial lawyer had a reasonable strategic basis for intentionally withholding an objection. *Compare Good, supra* at 32 (declining to find trial counsel's performance ineffective because extensive cross-examination of witness "would only highlight damaging portions of the testimony").

Trial counsel handled Mr. Carbone's testimony very effectively. He asked only one question, but it was one that revealed to the jury that Carbone himself did not believe Woods had been paid by petitioner (or anyone else) to kill Whiting. N.T. June 26, 2013, pp. 179-80. The answer elicited by that question undermined the prosecutor's plan to use Carbone to bolster Woods's credibility. Carbone had already testified on direct examination that he had given his grand jury testimony in order to obtain leniency on pending criminal

23

charges, and that his ability to recall Woods's statement was impaired by the drugs he was taking for his paranoid schizophrenia, hence there was no need for further cross examination. Therefore the record shows that petitioner could not prove the second and third elements of his claim of ineffectiveness, *i.e.*, lack of a reasonable strategic basis for counsel's course of action, and resulting prejudice.

### 3. The "after discovered evidence," apparently in the form of a document allegedly signed by Christopher Carbone, does not support the remedy of a new trial

The foregoing comparison between the facts of record and the allegations of the May 4th petition reveals the significance of attorney Younts's choice not to follow the specific instruction, in the order of August 18th, to "specify the portions [of testimony] Mr. Carbone would recant, with citations to the pages of the transcribed notes his trial testimony...." Readers of this opinion will gain a full understanding of the lack of merit of this claim by reading Mr. Carbone's trial testimony and attempting to determine which parts of that testimony, if recanted (not expunged), would change the outcome if petitioner was given a new trial. (See n.3, *supra*, and text accompanying note.)

Attorney Younts supplemented the record with a document styled as a "Verification of Christopher Carbone" (hereinafter, the Verification). The Verification is a written statement that purports to have been signed by Mr. Carbone. The document states,

> I was asked by Bruce Woods to assist him in putting the blame for
> a murder on Tyuan Simon. Mr. Woods believed that the police

24

were already looking to charge Mr. Simon and so he developed a plan to ensure that Mr. Simon would be the one charged with murder.[4] At that time, I did not know Tyuan Simon, and I believed that assisting Mr. Woods with his plan would help him and *I hoped it would help me get time off my sentence.*

*At no point did Tyuan Simon or anyone affiliated with him ever try to threaten or coerce me to lie or not to testify. I made that information up* at the prompting of Mr. Woods.

September 11th petition, Exhibit 2 (Verification) (italics added).

Petitioner incorrectly characterizes the Verification as a recantation of Mr. Carbone's trial testimony, but the two are completely consistent. Carbone *did* testify that he lied to the grand jury in order to receive a more favorable sentence, but he *did not* testify that petitioner or anyone affiliated with him threatened him or his family. Mr. Carbone spontaneously stated that he feared retaliation against himself and his family, but he also stated he was mentally ill and acted as if he was acutely paranoid. The prosecutor, not Mr. Carbone, referred to his reaction when Sidel Simon entered the courtroom. His behavior did not require the jury to infer that petitioner or his allies threatened Mr. Carbone: it permitted the jury to infer that his fear of retaliation, whether paranoid or rational, stemmed from knowing that his imprisonment rendered him and his family vulnerable.[5]

---

[4] This sentence in the Verification added to Mr. Carbone's testimony, but it fails to support petitioner's claim for post-conviction collateral relief. It states that the alleged plan by Mr. Woods ensured that petitioner would be the only one charged with murder, when such a plan would only have caused petitioner to be charged along with Mr. Woods, as he was. If there was any such plan, it did not prevent Woods from receiving a life sentence for murdering Whiting.

[5] **Exploitation of that vulnerability after the trial is precisely the harm the undersigned attempted to avert by the constraints placed on counsel by the order of August 18th.** For that reason, it is disquieting that attorney Younts went beyond

25

Regardless of the purported recantation, Mr. Carbone's trial testimony cannot be expunged from the record and would remain relevant and admissible to test Mr. Carbone's veracity at a new trial. If Mr. Carbone were called to testify at a new trial and failed to testify about Woods's prior consistent statement, then the prosecutor could impeach him with his prior inconsistent statements to the grand jury, Pa.R.E. 607, 613, 803.1(1)(A). Petitioner could count on Mr. Carbone to disclaim the veracity of his grand jury testimony (as he did at the first trial), but the prosecutor could respond by asking Mr. Carbone if his new testimony was influenced by fear of retaliation. *See Baston, supra.* If he denied fearing retaliation, the prosecutor could impeach him with his trial testimony. In sum, one would expect that the facts before the jury at a new trial would not be materially different from the facts adduced at the first trial. Consequently, a new trial would not serve as a remedy for the alleged harm that occurred when Mr. Carbone testified at the first trial; and conversely, the exchange between the prosecutor and Mr. Carbone at the first trial did not prejudice him in comparison to the exchange one would expect at a retrial.

---

what the order of August 18th allowed by apparently procuring a statement from Mr. Carbone, and then attempting to capitalize on it by filing the September 11th petition. The order directed Mr. Younts to supply additional facts and argument regarding the claim pertaining to Mr. Carbone. The applicable rules did not permit him to further amend the petition as of right at that time. See section III.D.1., below. Nonetheless, when the undersigned denied post-conviction relief in the order of September 13, 2017, she expressly stated that she **considered the September 11th petition. Likewise, the initial opinion in this appeal (filed December 1, 2017) and the instant opinion both address the September 11th petition** in conjunction with the claims raised in the PCRA court and on appeal.

26

**C.** **Petitioner failed to plead direct evidence that the prosecuting attorneys were motivated by racial discrimination when exercising their peremptory strikes during jury voir dire**

Petitioner claimed that trial and appellate counsel "failed to object to, or place on the record at trial, the issue that petitioner was tried and convicted by a jury tainted by racial exclusion." May 4th petition at p. 10; *see also id.* at ¶ 31. As a result, he argued, he was deprived of the equal protection of the law, citing *Batson v. Kentucky*, 476 U.S. 79, 85 (1986). May 4th petition at ¶ 31. In such circumstances, *Commonwealth v. Uderra*, 862 A.2d 74 (Pa. 2004) establishes the elements of a *Batson* claim. *See Commonwealth v. Sepulveda*, 55 A.3d 1108, 1132 (Pa. 2012) (discussing *Uderra*).

Normally, a defendant may plead a *prima facie Batson* claim by raising an inference of discrimination "from the totality of relevant circumstances." *Uderra* at 84. Examples of circumstantial evidence sufficient to support such an inference include, *inter alia*, a pattern of specific race-based strikes of venirepersons, or a single strike combined with statements and questions by the prosecutor. *Id.* at 84-85 (discussing and quoting *Holloway v. Horn*, 355 F.3d 707, 728-29 (3d Cir. 2004)). Circumstantial evidence of discrimination suffices only if petitioner's trial lawyer makes a *Batson* objection during the voir dire process and identifies "the racial or ethnic heritage of venirepersons in question" so the prosecutor has an opportunity to explain the reason for the strike and the trial judge can decide the claim in view of the evidence. *Id.* at 85.

Circumstantial evidence does not suffice when, as in this case, "there simply was no *Batson* objection raised during the *voir dire* process to trigger the requisite, contemporaneous inquiry." *Id.* In circumstances such as these, "a post-conviction petitioner may not rely on a *prima facie* case under *Batson*, but must prove actual, purposeful discrimination by a preponderance of the evidence...." *Id.* at 87. In *Uderra*, the claim was held to be deficient because it was not supported by averments of "*direct* evidence of purposeful discrimination." *Id.* (italics added). Therefore, one may infer from *Uderra* that averments of circumstantial evidence are insufficient to plead a *Batson* claim on collateral review if trial counsel failed to object during the *voir dire* process. *Sepulveda* lends further support to this interpretation, as the Court faulted the appellant's lawyer for failing to support the claim with an "*objective* factor that should have indicated...that the Commonwealth's challenge was for the nefarious reason appellant now imagines and alleges...." 55 A.3d at 1133 (italics added).

The May 4th petition did not plead that the prosecuting attorneys exercised any peremptory strikes, nor the race of any juror so stricken, nor any direct evidence relevant to prove purposeful discrimination in the exercise of peremptory strikes by the prosecuting attorneys. The undersigned notified petitioner of the defect and granted him leave to amend his petition to cure it, but he failed to do so. Petitioner replied in paragraph thirteen of the July 25th petition that he was "prepared to testify that he requested his counsel object to

28

the prosecut[or]'s use of peremptory strikes and that his counsel failed to do so[,]" but such testimony could at best be expounded at a hearing into circumstantial evidence of discrimination. Petitioner candidly admitted that he had "no additional facts or information to present to this Court related to this claim for relief." *Id.* at ¶ 12. Assuming petitioner had given that exact testimony and that it was given full credibility, there would still have been no genuine issues as to any material fact relevant to direct evidence of purposeful discrimination, and petitioner would not have been entitled to post-conviction collateral relief. Together, the May 4th and July 25th petitions devoted nine paragraphs to legal discussion of this claim, but both "inexplicably" failed to acknowledge *Uderra,* plead facts sufficient to meet the test established by *Uderra,* or argue for a change in the decisional law established by *Uderra. See Sepulveda* at 1133 ("appellant inexplicably fails to acknowledge the *Uderra*…standard…."). Therefore, petitioner was entitled to no relief.

**D. The undersigned judge did not err by denying PCRA relief without holding an evidentiary hearing**

Petitioner claims on appeal that the undersigned erred by denying, "without a hearing, [petitioner's] claim that he is entitled to a new trial as a matter of law on the basis of after-discovered evidence which was available at the time of trial." This section will first show that the undersigned judge complied with the procedural requirements regarding denial of the petition without a hearing, and will then show that disposition to be substantively correct.

29

## 1. Procedure for denial of PCRA relief without a hearing

The process of denying PCRA relief without a hearing is established by Pa.R.Crim.P. 905 and 907. "When a petition is defective as originally filed," Rule 905(B) requires the PCRA judge "to order amendment of the petition, indicate the nature of the defects, and specify the time within which" the petitioner must file an amended petition curing the defect or defects. Pa.R.Crim.P. 905(B); *see also Commonwealth v. Williams*, 782 A.2d 517, 527 (Pa. 2001) (construing Pa.R.Crim.P. 1501(b), since renumbered Pa.R.Crim.P. 905(B)). The undersigned judge did so in response to the May 4th petition, by filing the order of July 17th, notifying petitioner that the second and third claims of the May 4th petition were defective. At that time, the undersigned also concluded that the first claim lacked merit but did not order attorney Younts to amend it pursuant to Pa.R.Crim.P. 905(B) because it alleged a valid ground for relief (ineffective assistance of trial counsel, see 42 Pa.C.S. § 9543(a)(2)(ii)) and cited the record as factual support for that ground (see May 4th petition, ¶ 16 (citing N.T. 6-25-13, pp. 158-77)).

The petitioner's procedural right conferred by Rule 905(B) is subject to two constraints. First, although judges must "freely allow" amendment "to achieve substantial justice," Pa.R.Crim.P. 905(A), the petitioner may not file an amended petition unless and until the PCRA judge grants leave to do so. *See Commonwealth v. Baumhammers*, 92 A.3d 708, 730 (Pa. 2014) (construing rule to enable petitioner to file amended PCRA petition only when directed or

30

granted leave to do so by PCRA judge). Second, the judicial obligation to give the petitioner an opportunity to amend a defective PCRA petition applies only to the petition as originally filed. *Williams*, 782 A.2d at 527, n.7. After the judge gives the petitioner one opportunity to amend the petition pursuant to Rule 905(B), the judge may exercise her discretion proceed under Rule 907(1) if the amended petition fails to plead grounds or facts supporting grounds for relief. *See id.* (stating that in capital case, judge may proceed under Rule 909, the capital-case analog to Rule 907, which applies to non-capital cases). Otherwise, the judge might be obligated to give a petitioner an infinite number of chances to amend a petition.

After the judge gives the petitioner one opportunity to amend the petition pursuant to Rule 905(B), the judge may deny relief without holding an evidentiary hearing if "there are no genuine issues concerning any material fact and...the defendant is not entitled to post-conviction collateral relief...." Pa.R.Crim.P. 907(1). The judge must consider the facts already on the record and also averments of other facts in a PCRA petition when determining whether to deny relief without a hearing. *See id.* (obliging judge to "review the petition...and other matters of record relating to the defendant's claim(s)."). A judge may not deny a PCRA petition without a hearing "when the facts alleged in the petition, if proven, would entitle the petitioner to relief" *Commonwealth v. Granberry*, 644 A.2d 204, 208 (Pa. Super. Ct. 1994). In doing so, the judge evaluates whether the petitioner has produced sufficient evidence by pleading

31

averments of fact in the petition, but does not evaluate the veracity or weight of the evidence. It is a "fundamental proposition that the PCRA requires a petitioner to plead and prove his claim, and, therefore, the dismissal of claims is appropriate where the pleadings are *insufficient* to state a claim for post-conviction relief." *Commonwealth v. Williams*, 782 A.2d 517, 526 (Pa. 2001) (italics altered from original). If an amended petition fails to raise any genuine issue concerning a material fact, it has not pled grounds for post-conviction collateral relief, and no purpose would be served by any further proceedings, in which circumstances the judge shall give the petitioner notice of intention to deny the petition, state in the notice the reasons for denying relief, and give the petitioner an opportunity to argue that the reasons are incorrect and show cause why the judge should grant relief without a hearing, hold an evidentiary hearing, or grant leave to amend the petition. Pa.R.Crim.P. 907(1).

The undersigned complied with the foregoing obligations established by Rule 907(1). The order of August 7th independently reviewed the July 25th and May 4th petitions as a single, integrated pleading for post-conviction collateral relief, stated that petitioner was not entitled to any relief, advised him that the undersigned intended to deny PCRA relief without a hearing and permitted him to file a response within twenty days. See order filed August 7, 2017, p. 22. As required by Rule 907(1), the order of August 7th stated the reasons the petition should be denied. The statement of reasons included legal argumentation and citations to controlling legal authority in substantially the

32

same level of detail as in sections III.A.-C., *supra*, hence counsel had adequate notice of how to cure the defects in the petition, if they were in fact curable.

On August 17th, attorney Younts filed a request for an extension of the period for filing a response "in order for...counsel to obtain a signed affidavit from witness Christopher Carbone that recants a portion of his trial testimony." The undersigned filed an order on August 18, 2017 that granted leave to file a response limited to argumentation, but Mr. Younts responded by filing the September 11th petition. By order filed September 13, 2017, the undersigned denied post-conviction collateral relief. As was expressly stated in the order, the undersigned considered the September 11th petition before deciding to deny post-conviction collateral relief. The original opinion on appeal from denial of PCRA relief and this opinion both address the facts and legal argument of the September 11th petition.

2.    **In view of the record as a whole, petitioner failed to plead grounds for post-conviction collateral relief**

Regarding the claim that counsel on direct appeal was ineffective for having failed to specify how the evidence was insufficient, proof that the trial evidence was insufficient to support the verdicts is necessarily limited to the evidence of record, hence additional evidence could not be relevant. There was no genuine issue as to any material fact as to this ground for relief, only a disagreement as to the legal conclusions to be drawn from certain facts. Therefore no purpose would have been served by a hearing to receive additional evidence from petitioner.

33

There was no genuine issue concerning any fact material to the claims regarding the testimony of Christopher Carbone. The trial record shows that the prosecutor never stated that Sidel Simon or anyone allied with petitioner intimidated Mr. Carbone. The prosecutor was permitted to ask why Mr. Carbone's demeanor changed when Sidel Simon entered the courtroom, hence trial counsel had no basis for objection. The Verification supposedly signed by Mr. Carbone did not recant any of his trial testimony: First, he spontaneously exclaimed that he falsified his grand jury testimony in order to receive a lenient sentence. Second, insofar as the Verification states that Mr. Carbone "made up" information that petitioner or someone affiliated with him threatened or coerced him, he never stated any such information inside the courtroom. He simply blurted out that he feared for his life and the lives of his family, without attributing the source of his fear to anyone. One may interpret the Verification in a manner that does not misrepresent the trial record, but that interpretation does not support relief in the form of a new trial. Therefore, no purpose would have been served by an evidentiary hearing on this claim.

As to the claim that the prosecutors used peremptory strikes in a racially biased manner, the May 4th petition and the July 25th petition together failed to plead facts sufficient to meet the test established by *Uderra*. Petitioner candidly admitted in paragraph twelve of his July 25th petition that he had "no additional facts or information to present to this Court related to this claim for relief." Therefore, there would have been no purpose served by any further

proceedings, such as a hearing to receive petitioner's proposed testimony.

## IV. Conclusion

In view of the foregoing discussion, the undersigned submits that the order denying post-conviction collateral relief should be affirmed.

BY THE COURT,

_____
Wendy Demchick Alloy, Judge

copies of the above order sent on 1/8/19
to the following:

Patrick J. McMenamin Jr, Esquire; McMenamin & Margiotti, LLC; 2307 North Broad Street, P.P. Box 180; Lansdale, PA 19446; by first-class mail

Adrienne D. Jappe, Assistant District Attorney, Appellate Division, by inter-office mail

35